**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE UBIQUITI NETWORKS, INC. SECURITIES LITIGATION | No. 1:18-cv-01620 |
| | <u>Class Action</u> |
| THIS DOCUMENT RELATES TO: ALL CASES | **<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>** |
| | **<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION .................................................................................. 1

II.     JURISDICTION AND VENUE .......................................................................... 7

III.    PARTIES ............................................................................................................ 8

IV.     SUBSTANTIVE ALLEGATIONS ..................................................................... 9

        A.      Background ............................................................................................. 9

        B.      Ubiquiti's History of Compliance Problems......................................... 12

        C.      Ubiquiti's Implausible "Disruptive Business Model" Based on the Ubiquiti Community ............................................................................... 25

        D.      Misstated Accounts Receivables and Ubiquiti's Relationships With Its Distributors ............................................................................................. 36

        E.      Pera's Control of the Company and Insider Sales ................................ 47

        F.      Ubiquiti Touted its New FrontRow Camera ......................................... 50

        G.      Additional Red Flags ............................................................................ 51

        H.      The SEC's Investigation ....................................................................... 52

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..................................................................... 53

        A.      Ubiquiti Reported False Accounts Receivable ..................................... 55

        B.      Ubiquiti's Statements Regarding Internal Controls Were False and Misleading . 61

        C.      Ubiquiti's False and Misleading Statements Concerning Its "Disruptive Business Model" ................................................................................... 65

        D.      Ubiquiti Inflated the Ubiquiti Community's Metrics and Level of Engagement . 67

        E.      Ubiquiti Had No Basis for its Forecasted Financial Performance Following the Citron Report .................................................................. 72

        F.      Ubiquiti Failed to Disclose the High Likelihood—or Existence of—the SEC's Investigation................................................................................ 73

G.      False and Misleading Statements Concerning Related-Party Transactions.......... 75

H.      False and Misleading Statements Continue After the Citron Report.................... 76

VI.     THE TRUTH BEGINS TO EMERGE ............................................................ 80

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 91

VIII.   NO SAFE HARBOR ...................................................................................... 98

IX.     CLASS ACTION ALLEGATIONS ................................................................ 99

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
        AND *AFFILIATED UTE* PRESUMPTIONS ................................................ 100

XI.     COUNT I ....................................................................................................... 101

XII.    COUNT II ...................................................................................................... 104

XIII.   PRAYER FOR RELIEF ................................................................................. 106

XIV.    DEMAND FOR TRIAL BY JURY ................................................................ 106

Plaintiff Xiya Qian ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Ubiquiti securities between May 9, 2013 and February 19, 2018, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     This action arises from Defendants' blatant misstatements concerning key aspects of Ubiquiti's operations and finances, including the number of registered users in the "Ubiquiti Community"—which, according to the Company, is "a global, grass-roots community of" individuals who engage in online forums on the Company's website—and the Company's accounts receivable.

3.     This matter also seeks to redress Defendants' many false and misleading descriptions of the Company's basic business model.  Ubiquiti financial performance presents a conundrum.  The Company is a new entrant into the highly competitive market for wireless routing technology.  Despite this significant challenge, Ubiquiti employs an unusually thin and inexperienced executive team and inadequate managerial oversight—including the absence for much of the Class Period of a Chief Financial Officer, and a Board of Directors with the bare minimum number of independent directors—with high levels of turnover.  Yet Ubiquiti has managed to post profit margins well above those of its more-established peers.

4.     Ubiquiti attributes this incongruity to what it calls its "disruptive business model." This refers to the Company's spending less than its competitors on traditional business expenses and selling its products at an attractive "price-performance" mix to traditionally underserved markets, largely in foreign countries.  In other words, the Company's products are not of the highest quality, but are favored by parties in underserved areas.

5.     This story that Ubiquiti has been telling the market does not add up.  First, Defendants have portrayed the Ubiquiti Community as the lynchpin of the Company's "disruptive business model."   According to Defendants, the Ubiquiti Community is "central to the success of our business."  Defendants also claim that the "Ubiquiti Community is a critical element of our business strategy as it enables us to drive" "[r]apid customer and community driven product development."   Ubiquiti even goes so far as to describe the Community as composed of "[h]ighly engaged and loyal evangelists" that provide a driver of market awareness that "avoids [a] traditional sales force," leads to "faster, lower cost product development," and is "[s]calable and self-sustaining."  This "Community," according to Ubiquiti, is worldwide group of enthusiastic customers, including "entrepreneurial operators and systems integrators," who

avidly discuss and promote Ubiquiti's products in an online forum on the Company's website.

6.     Ubiquiti attributed the success of the Ubiquiti Community to the size of its user base.  The Company boasted that its Community included over 4 million members and noted that the level of support from the Community was "driven by the size and engagement of our customer base."

7.     It turned out, however, that the Ubiquiti Community was nowhere near that size. On November 9, 2017, Ubiquiti admitted that it had overstated the number of registered users in the Community from the approximately 609,000 that actually existed to the over 4 million that the Company claimed.

8.     Ubiquiti revealed this information only because several weeks earlier, Citron Research—a prominent market analyst that investigates potential corporate fraud—published a report arguing that many aspects of Ubiquiti's operations, including the size of the Ubiquiti Community, were fraudulent (the "Citron Report").  The Citron Report also showed that even the number of Ubiquiti Community accounts that did exist was misleading because the majority of those accounts were actually created by bots rather than real people.

9.     The falsity of Ubiquiti's description of its Community showed that a major pillar of its "disruptive business model" had no basis in fact.   Rather than Ubiquiti's financial performance arising from its supposedly "evangelical" user community and the appeal of its products in "underserved" areas, the Company's results are more likely grounded in the improper practices of Ubiquiti's distributors that it relies on for its entire business flow and the Company's inadequate accounting for their activity.

10.     Ubiquiti sells 99% of its products through distributors rather than directly to consumers.  The majority of those sales take place outside the United States.  But Ubiquiti has a

long history of problems with its distributors.  Until at least early 2011, two of Ubiquiti's distributors sold the Company's products to parties in Iran, in violation of United States sanctions laws.  When Ubiquiti settled charges arising out of that issue with the U.S. Office of Foreign Asset Control ("OFAC") in 2014, OFAC determined that Ubiquiti "did not voluntarily disclose the apparent violations," "demonstrated reckless disregard for U.S. sanction requirements," and "members of Ubiquiti's senior management knew or had reason to know that Ubiquiti products were reexported to Iran."  OFAC also concluded that "Ubiquiti engaged in a pattern of conduct over five years that resulted in several apparent violations during that period," and "Ubiquiti had no OFAC compliance program in place at the time of the apparent violations."

11.     Ubiquiti's compliance failures continued unabated.  In 2015, after the Company lost approximately $47 million to an e-mail fraud, it was revealed that the Company entirely lacked internal controls over financial reporting.  Ubiquiti disclosed at that time that the Company's internal control failures included—among other basic flaws described below—"a lack of sufficient, competent personnel necessary for effective financial reporting," which "resulted in the lack of comprehensive and up-to-date accounting policies and procedures, skepticism on the part of key accounting personnel, internal control training, leadership and [in]adequate communication of roles and responsibilities."

12.     These internal control deficiencies were so severe that for two straight years, PricewaterhouseCoopers LLP ("PwC"), Ubiquiti's independent auditor, refused to issue a clean audit opinion.  Rather than address these severe internal control deficiencies to PwC's satisfaction, on December 5, 2016, Ubiquiti fired PwC as the Company's independent auditor.

13.     To make matters worse, the few distributors that Ubiquiti has disclosed as accounting for a large portion of the Company's revenue during the Class Period have had

significant questions raised about the propriety of their business practices and their undisclosed relationships with Ubiquiti. This history has led to a concern that Ubiquiti does business with "shady distributors."

14.    For example, the founder of one of Ubiquiti's major distributors has been arrested in Brazil for embezzlement and other crimes of deceit—including the smuggling of electronics equipment in Paraguay.  That individual has also reported sales figures that were nowhere near the amount of revenue that Ubiquiti attributed to that distributor.

15.    Similarly, Ubiquiti has reported the accounts receivable that it attributed to specific distributors only for the few distributors that owed over 10% of Ubiquiti's total accounts receivables.  And even then, starting in 2016, Ubiquiti stopped disclosing those distributors by name.  The amount of accounts receivable that Ubiquiti attributed to two of these distributors was far greater than the amounts that these distributors reported to their foreign governments as having owed for goods purchased for their entire operations.  Ubiquiti therefore did not have a sufficient basis for the amount of accounts receivable that it reported during the Class Period.

16.    At best, Ubiquiti's failure to oversee the practices of its distributors was a direct result of Defendant Robert Pera's decision to run Ubiquiti like his personal fiefdom rather than as a company owned by all of its shareholders.  Ubiquiti's lack of internal controls and its inadequate executive and Board oversight were both intentional decisions by Pera not to devote resources to those types of oversight activities.  Pera's reckless decision to eschew standard internal control practices and forms of corporate oversight render him even more responsible for his misstatements concerning Ubiquiti's operations.

17.    On September 18, 2017, the Citron Report was published.  The Report raised facts related to some of these allegations, including that the Ubiquiti Community and the Company's

accounts receivable metrics were false, that the Company had a poor corporate culture, and that Ubiquiti's financial performance was far more likely to be attributable to the improper practices of Ubiquiti's distributors or to financial misstatements than to the "disruptive business model" that the Company touted.

18.     The Citron Report, however, only partially revealed information about some of these issues.  Ubiquiti employed a two-pronged strategy in response to the Report.  First, other than the Company's November 9, 2017 admission that the Ubiquiti Community metrics were false, Defendants—and Pera specifically—vehemently denied the allegations in the Report and continued to tout the same misstatements concerning the Company's performance and business model that they had since the beginning of the Class Period.

19.     This strategy was on full display in several statements that Defendant Pera made on Twitter the same day as the Citron Report, as well as at Ubiquiti's first-ever Investor Day conference, which it held on September 26, 2017, just one week after the Citron Report.  Pera stated on Twitter in direct response to the Citron Report, "I just put my head down and let the products and numbers speak for themselves.  My apologies to those affected by these clowns."

20.     Second, Ubiquiti repeatedly disclosed separate positive news that distracted the market from the facts revealed by the Citron Report.   This strategy led the Company to make yet additional misstatements.   For example, on November 9, 2017, Ubiquiti forecasted unrealistically positive results for the second quarter of its fiscal 2018, even though that quarter was already well underway and Ubiquiti therefore already knew that its new FrontRow camera product was not living up to expectations.  The falsity of these statements came to light when the Company disclosed its disappointing results for the quarter on February 8, 2018, which failed to meet expectations solely because the Company was forced to writedown its entire FrontRow

inventory due to the product's extremely poor sales.[1]

21.     Furthermore, Defendants' forceful denials of the allegations raised by the Citron Report were part of Ubiquiti's consistent pattern of failing to disclose the extent of its problems. For example, even when Ubiquiti was forced to admit its internal control failures after the theft of nearly $47 million in 2015, Defendants downplayed key aspects of these flaws—including the potential for Ubiquiti's financial statements to be false as a result of these failures.

22.     As a result of Defendants' constant obfuscation concerning the Company's business model and internal controls, they misled investors concerning the high likelihood that these problems would lead to increased regulatory oversight and enforcement.  The investing public was therefore shocked to learn before the market opened on February 20, 2018, that the Securities and Exchange Commission ("SEC") had issued subpoenas to Ubiquiti "and certain of [its] officers requesting documents and information relating to a range of topics, including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties." In other words, the SEC was investigating the very topics that the Citron Report raised and that Defendants so emphatically denied following the Report's publication.

23.     In reaction to the Company's alarming February 20, 2018 disclosure of the SEC's investigation, Ubiquiti's stock price fell over 25% on just that day, wiping out a substantial portion of shareholder value.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

---

[1] Ubiquiti operates on a fiscal year ending June 30 of the year designated as the fiscal year.  For example, the Company's fiscal 2017 ran from July 1, 2016 to June 30, 2017.

SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

26.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Ubiquiti's principal executive offices are located within this Judicial District.

27.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.    PARTIES

28.     Plaintiff acquired Ubiquiti securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

29.     Defendant Ubiquiti is incorporated in Delaware, with principal executive offices located at 685 Third Avenue, 27th Floor, New York, New York 10017.  Ubiquiti's shares trade on the NASDAQ under the ticker symbol "UBNT."

30.     Defendant Robert Pera has served at all relevant times as the Company's Chairman, Chief Executive Officer ("CEO"), and founder.

31.     Defendant Craig L. Foster ("Foster") served as the Company's Chief Financial Officer ("CFO") from March 4, 2013 to April 21, 2015.

32.     Defendant Mark Spragg ("Spragg") served as the Company's Interim Chief Accounting Officer and Interim Principal Financial Officer from August 4, 2015 to May 3, 2016.

33.     Defendant Kevin Radigan ("Radigan") has served as the Company's Chief Accounting Officer and Principal Financial Officer since May 3, 2016.

34.     The Defendants referenced above in ¶¶ 30 to 33 are sometimes referred to herein as the "Individual Defendants."

35.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

36.     Ubiquiti was founded by former Apple engineer, Robert Pera, in 2005.  The Company develops technology platforms for hi-capacity distributed Internet access, unified information technology, and next-generation consumer electronics for home and personal use. It groups its products and services into three main categories: high performance networking technology for operator-owners of wireless internet services ("WISP's"), enterprises and consumers globally.  Ubiquiti's portfolio of wireless networking products and solutions includes high performance radios, antennas and management tools for wireless networking and other

9

applications in the unlicensed radio frequency ("RF") spectrum.   Ubiquiti's stated goal is to "connect everyone to everything, everywhere."

37.   Ubiquiti does not employ a traditional sales force. Instead, it purports to "drive[] brand awareness largely through the company's user community where customers can interface directly with R&D, marketing, and support." The Company calls this user community the "Ubiquiti Community."

38.   According to Ubiquiti, its technology platforms were "built from the ground up with a focus on delivering highly-advanced and easily deployable solutions that appeal to a global customer base in underserved and underpenetrated markets."

39.   The Company further claims that its "differentiated business model"—including its reliance on the Ubiquiti Community and its saving on marketing, support, and research and development costs, "has enabled us to break down traditional barriers such as high product and network deployment costs and offer solutions with disruptive price-performance characteristics." According to Ubiquiti, "[t]his differentiated business model, combined with our innovative, proprietary technologies, has resulted in an attractive alternative to traditional" higher-cost and more-established competitors.

40.   Pera, as Ubiquiti's CEO, Chairman, founder, and majority owner, actively runs the Company.  He stated at a September 26, 2017 Investor Day presentation that "I don't want to be the leader in the movies that sits up high in a castle and watches all of his soldiers, who he feels expendable get killed off one by one. I want to be the guy leading by example. I want to be the guy on the battlefield. And I think that top-down accountability is very important because when you have the small teams and something goes wrong, the worst thing for culture is somebody saying, 'Well, that's not my job.' If somebody sees a problem, they have to attack it.

Just like I attack it. I don't consider myself lower -- above any job. I'll go into the forums, I'll go into the lab, I'll rework products, I don't care. I want that culture. And that's why I do the things I do."

41.     As Morningstar noted in an October 2, 2017 analyst report, "Pera owns 67% of the voting shares, and we consider Ubiquiti to be overly dependent on his judgment and decision-making. While his decisions are more likely than not aligned with the interests of shareholders, we believe the company would be better served with more checks and balances and standard corporate controls installed throughout its organizational structure. The company has changed CFOs twice in the past four years, and the CFO position is currently vacant. Ubiquiti's bare-bones organizational structure and consequent lack of controls in place may have left the company exposed to various challenges. . . .  Finally, Pera acquired the Memphis Grizzlies NBA basketball team in 2012, which may prove to be a distraction, given his very hands-on approach to managing Ubiquiti."

42.     Ubiquiti states that as its founder, Chairman, CEO, and majority owner, Pera "is able to exercise voting rights with respect to a majority of the voting power of our outstanding stock and therefore has the ability to control the outcome of matters submitted to our stockholders for approval, including the election of directors. . . .  In addition, Mr. Pera has the ability to control the management and major strategic investments of our company as a result of his position as our [CEO] and his ability to control the election or replacement of our directors. . . .  As a board member and officer, Mr. Pera owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in [their] best interests. . . . As a stockholder, even a controlling stockholder, Mr. Pera is entitled to vote his shares in his own interests, which may not always be in the interests of our stockholders generally."

B.      **Ubiquiti's History of Compliance Problems**

43.     As the Morningstar report referenced above explained, throughout Ubiquiti's history, the Company's—and, specifically, Pera's—decision to forego traditional operational and compliance structures has led to a series of significant problems.

44.     Ubiquiti runs its business through a distributor business model.  It sells its products "worldwide through a network of over 100 distributors and on-line retailers. The Company has a very broad installed base with over 70 million devices sold in over 200 countries and territories around the world, since inception."  Sales to distributors accounted for between 98% and 99% of the Company's revenue each year during the entire Class Period.

45.     A "substantial majority" of Ubiquiti's sales through its distributor network are to parties located in foreign countries around the world.

   a.      ***Violations of U.S. Sanctions and Other Regulations Prohibiting Sales to Certain Parties***

46.     Like all U.S. companies, Ubiquiti's sales to certain foreign countries (such as Iran, Cuba, Syria, the Sudan and North Korea) and suspicious entities are restricted or prohibited under U.S. economic sanctions laws and export controls.  These regulations are particularly applicable to Ubiquiti because of the type of technology that it sells, some of which includes sensitive encryption components.

47.     In January 2011, the U.S. Commerce Department, Bureau of Industry and Security's Office of Export Enforcement ("OEE") contacted Ubiquiti to request that the Company provide information related to its relationship with a logistics company in the United Arab Emirates ("UAE") and with a company in Iran, as well as information on the export classification of its products.  Ubiquiti stated that in response to this request, it conducted an investigation of the Company's export transactions from 2008 through March 2011.

48.     This review led to Ubiquiti filing disclosure statements in May and June 2011 with OEE and with the U.S. Department of the Treasury's Office of Foreign Asset Control ("OFAC"), respectively, regarding certain export transactions from 2008 through March 2011 in which the Company's products were resold—in violation of U.S. export control and economic sanctions laws—into Iran by third parties.

49.     Even after Ubiquiti's senior management knew about these violations and began implementing policies that would supposedly prohibit sales of the Company's products into the countries subject to the U.S. embargo, its two distributors under review sent Ubiquiti e-mails showing that they "continued to sell, directly or indirectly, [Ubiquiti's] products into Iran during the period from February 2010 through March 2011."   Then, even after learning of this information, Ubiquiti continued to do business with one of these two distributors.

50.     Ubiquiti blamed these serious compliance violations on the fact that "[u]ntil early 2010, we lacked sufficient familiarity with the export control and sanctions laws and their applicability to our products. Our lack of sufficient familiarity was largely due to our lean corporate infrastructure, the inexperience of our management team in these matters and the fact that our products are manufactured outside the United States and most of our products never enter the United States."

51.     This excuse simply reflects Ubiquiti's more general view toward compliance. Pera, after all, founded Ubiquiti in 2005.

52.     Then, on March 4, 2014, Ubiquiti entered into a settlement agreement with OFAC in which the Company agreed to pay $504,000 to the U.S. Department of the Treasury for the Company's violations of the Iranian Transactions and Sanctions Regulations ("ITSR") from March 2008 through February 2011 related to its two distributors that sold products into Iran.

13

53.     At the time of this settlement, OFAC announced that Ubiquiti "did not voluntarily disclose the apparent violations," "demonstrated reckless disregard for U.S. sanction requirements," and "members of Ubiquiti's senior management knew or had reason to know that Ubiquiti products were reexported to Iran,"  "Ubiquiti engaged in a pattern of conduct over five years that resulted in several apparent violations during that period" and "Ubiquiti had no OFAC compliance program in place at the time of the apparent violations."[2]

### b.     *Ubiquiti's Failure to Maintain Internal Controls*

54.     Ubiquiti's lax compliance culture has also resulted in other disastrous consequences for the Company.  In August 2015, Ubiquiti disclosed that it learned two months earlier that the Company had been the victim of a criminal fraud that supposedly tricked the Company's finance and accounting team to transfer $46.7 million—or 10% of the Company's cash on hand—to the fraudsters.

55.     The details of this incident, however, were not disclosed until November 9, 2015, when the Company responded to the SEC's questions about this incident.  At that time, it was revealed that Pera learned about this breach when the FBI notified him in June 2015 of the possible theft of a large amount of money from the Company's Hong Kong unit.  By that time, the Company had already transferred almost $47 million through 14 wire transfers to Russia, China, Hungary, and Poland.  According to Ubiquiti's own explanation, the fraudulent wire transfers thus would have continued had the FBI not notified Pera of them.[3]

56.     Ubiquiti blamed the breach on Rohit Chakravarthy, who had been the Company's

---

[2] *See* March 6, 2014 OFAC Press Release, *available at* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20140306_Ubiquiti.pdf.

[3] Nathan Vardi, "How a Tech Billionaire's Company Misplaced $46.7 Million and Didn't Know it," *Forbes*, Feb. 8, 2016 (*available at* https://www.forbes.com/sites/nathanvardi/2016/02/08/how-a-tech-billionaires-company-misplaced-46-7-million-and-didnt-know-it/#7bd9601a50b3, *last accessed* December 21, 2018).

Chief Accounting Officer for just one month before the fraud took place.  Chakravarthy attained that role because Defendant Foster had just resigned from being the Company's Chief Financial Officer.  Chakravarthy is the only person that Ubiquiti named as having received any of the fraudsters' e-mails.

57.    At best, this fraud indicates a severe compliance breakdown because, under accounting and compliance best practices, such large sums would not have been able to have been sent outside the Company without the approval of at least one additional senior employee separate from Chakravarthy.

58.    Chakravarthy resigned from Ubiquiti around the time that the Company initially disclosed this incident to the public in August 2015.  He proceeded to get a corporate finance job with a private mobile advertising company where Defendant Foster was the CFO.

59.    Pera described this $46.7 million fraud as "an embarrassing situation," but reassured investors that it was "an isolated incident that basically a couple individuals within the accounting group displayed incredibly poor judgment and incompetence."  He also assured investors that "We're taking it really seriously. It's embarrassing. All I can say is everybody knows how big of an issue it is. I've inserted myself into the finance team and I will have more presence there moving forward to make sure that this can't happen again."

60.    Partly as a result of the $46.7 million theft of Company funds, PwC, Ubiquiti's independent auditor, refused to give Ubiquiti a clean audit opinion with respect to the Company's internal controls over financial reporting.  Instead, PwC concluded for Ubiquiti's fiscal 2015 (which ended June 30, 2015) that, in its opinion, "the Company did not maintain, in all material respects, effective internal control over financial reporting as of June 30, 2015, based on criteria established in Internal Control - Integrated Framework (2013) issued by the

Committee of Sponsoring Organizations of the Treadway Commission (COSO) because material weaknesses in internal control over financial reporting related to control environment, including safeguarding of the Company's funds and timeliness of detecting improper transactions, and related to the maintenance of user access and transaction privileges to modify and post entries to the general ledger and subsidiary ledgers  existed as of that date." This means that PwC was unable to attest to the operating effectiveness of Ubiquiti's system of internal controls surrounding the preparation of its financial statements.

61.     PwC determined that these material weaknesses in Ubiquiti's internal controls remained the following fiscal year, which ended June 30, 2016.

62.     Management's review of Ubiquiti's system of internal controls over financial reporting, which was based on the framework set forth in *Internal Control-Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, determined that Ubiquiti's internal control failures included "a lack of sufficient, competent personnel necessary for effective financial reporting," which "resulted in the lack of comprehensive and up-to-date accounting policies and procedures, skepticism on the part of key accounting personnel, internal control training, leadership and adequate communication of roles and responsibilities."

63.     The Company also explained that Ubiquiti's "failure to maintain an effective control environment contributed to a second deficiency in the form of ineffectively designed and maintained controls required for safeguarding of the Company's funds and timely detection of improper transactions in the general ledger. Specifically, the Company's disbursement authorization policies were not updated timely for changes in personnel and positions nor were authorization requirements clearly stated, including those for non-routine transactions."

64.     Furthermore, "[t]he Company's failure to maintain an effective control environment also contributed to a third deficiency in the form of ineffectively designed and maintained controls over user access and transaction privileges to modify and post entries to the general ledger and subsidiary ledgers."  The Company explained that "the scope of user access and transaction privileges to the general ledger and subsidiary ledgers is not sufficiently restricted to provide reasonable assurance of effective process and review controls over postings to the general ledger. Additionally, recent general ledger changes were completed without due consideration of collateral impacts on segregation of duties controls."

65.     Ubiquiti explained that "[t]hese control deficiencies could result in misstatements of accounts or disclosures that would each result in a material misstatement of the interim or consolidated financial statements that would not be prevented or detected and, therefore, management has determined that these control deficiencies constitute material weaknesses."

66.     Because of these material weaknesses, Ubiquiti concluded that the Company did not maintain effective internal controls over financial reporting from the end of fiscal 2015 through at least March 2017 (the end of the third quarter of the Company's fiscal 2017).

67.     Rather than address these severe internal control deficiencies to PwC's satisfaction, on December 5, 2016, Ubiquiti fired PwC as the Company's independent auditor and hired KPMG LLP ("KPMG") in its place.  The Company did not explain the reason for PwC's dismissal, but recounted the Company's failure to maintain effective internal controls.

68.     Then, in Ubiquiti's Annual Report for the fiscal year ended June 30, 2017, the Company described its material weaknesses in internal controls over financial reporting as having been in the past.  The Company stated that it had "completed the remediation efforts of such material weakness, completed testing of the controls to address such material weaknesses

17

and concluded that the previously reported material weaknesses in internal controls over financial reporting have been satisfactorily remediated as of June 30, 2017."

69.     A confidential witness that served as a VP of Operations at Ubiquiti from June 2017 through early 2018 has explained that by the time he arrived at Ubiquiti, the Company had replaced its entire accounting department as a result of the $46.7 million fraud.

70.     Yet, when describing its remediation efforts in its quarterly and annual SEC filings, Ubiquiti stated—starting with its quarterly report for the quarter ended March 31, 2016 and continuing through its 2017 annual report (after which time the Company described its internal control failures as being in the past)—only that "[r]egarding the lack of sufficient, competent personnel necessary for effective financial reporting, we recruited and transitioned the leadership team within the finance organization by adding additional qualified and experienced personnel."  The Company did not state that it had replaced the entire accounting department that existed at the time of the fraud.

71.     Moreover, given the all-encompassing breadth of Ubiquiti's lack of internal controls, it is impossible that neither Ubiquiti's management nor PwC (Ubiquiti's auditor its entire time as a public company) were aware of these gaping holes until August 2015.

72.     Ubiquiti's statements about its internal control failures also do not hold up because Defendants claimed in the Company's 2015 10-K on August 21, 2015 that the Company's Interim Chief Accounting Officer at the time (i.e., Defendant Spragg, who also signed the Form 10-K), "evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2015."  But Defendant Spragg did not start working at the Company until just a couple of weeks earlier, on August 4, 2015, and long after June 30, 2015.

73.     Similarly, Defendants claimed in Ubiquiti's 10-Q for the quarter ended March 31,

2016, which was filed on May 5, 2016, that the Company's Chief Accounting Officer (i.e., Defendant Radigan, who also signed the Form 10-Q), "evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2016."  But Defendant Radigan did not start working at the Company until May 3, 2016, just two days before signing this quarterly report, and long after March 31, 2016.

74.     These incongruities cast doubt on the truthfulness of all of Ubiquiti's statements about its pervasive internal control failures, including who discovered them, when they were discovered, the sufficiency of the Company's internal assessments, and the extent to which they were actually remedied as of June 30, 2017 (when Ubiquiti claimed they were).

75.     Ubiquiti's statements about its internal control failures were also inconsistent with the very purpose of such compliance protections.  The main purpose of the requirement established by the Sarbanes-Oxley Act of 2002 ("SOX") that companies maintain effective controls over financial reporting is to ensure the sufficiency of their financial disclosures.  Under 17 C.F.R. § 210.13a-15(f), the "term *internal control over financial reporting* is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

76.     As PwC stated when it refused to give Ubiquiti a clean audit opinion, including in its letter contained in the Company's 2015 and 2016 10-Ks, "[a] material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis."

19

77.     Ubiquiti's material weaknesses over internal controls therefore, by definition, indicate that Defendants could not ensure that the portions of the Company's financial statements related to its internal control failures were accurately prepared in accordance with GAAP.

78.     Even so, in each of Ubiquiti's annual and quarterly SEC filings from the time that it disclosed its material weaknesses (in its 2015 annual report) through the end of the Class Period, Ubiquiti stated that "management has determined that the foregoing material weaknesses did not result in a material misstatement in the consolidated financial statements" at any time since the material weaknesses were found.

79.     This conclusion is patently incongruous and without any basis in fact.   The fundamental material internal control deficiencies that Ubiquiti described applied to the entirety of the Company's internal control structure.   These broad failures were not confined to any particular reporting areas or accounts.

80.     Given how pervasive these problems were and the fact that the Company only first began to remediate them in mid-2015, Defendants could not possibly have confirmed that its "material weaknesses did not result in a material misstatement in the consolidated financial statements."   Such confirmation would have involved reviewing every transaction in the Company's history—a task that Ubiquiti could not possibly (and did not claim to) have completed in such a short amount of time with such severely deficient internal controls.

81.     Moreover, because of all of these false or misleading statements concerning the nature and extent of the Company's internal control failures, Defendants failed to disclose the risk that the Company would face governmental regulatory actions concerning these failures. This omission was particularly misleading after the Company stated in its 2017 annual report and subsequent periodic SEC filings that "[w]e have completed our testing of the controls discussed

above and conclude that our previously reported material weaknesses in our internal controls over financial reporting have been satisfactorily remediated as of June 30, 2017." Giving investors the impression that the Company's internal control failures were entirely in the past was misleading without further separate disclosure that such failures had a high likelihood of leading—or, as explained below, already did lead—to regulatory oversight or other governmental enforcement activity.

82.     At Ubiquiti's September 26, 2017 Investor Day presentation following the Citron Report, Pera continued to describe Ubiquiti's inadequate internal controls as having been in the past.  He stated that those deficiencies resulted from his failing to provide the financial team with sufficient resources.  Pera explained "[e]verybody knows I give preferential treatment to R&D and drivers and value makers. And, I think, there was some animosity with the financial team, a lot of them came from that private equity events. And it was just bad, it's kind of gotten cancerous."  Even then, however, Pera did not disclose the ramifications of the Company's internal control failures, including the high likelihood that the SEC would be—or already was—investigating those problems.

### c.     *Thin Executive Ranks with High Turnover*

83.     Ubiquiti's past compliance failures are part of a pattern that has plagued Ubiquiti for its entire corporate its history.  Ubiquiti has portrayed the small size and inexperience of its management team, as well as its Board of Directors containing (at most) the bare minimum of members, as part of the Company's lean, cost-saving and upstart approach.  But Defendants did not acknowledge that eschewing traditional management and oversight structures and safeguards comes with great costs.

84.     Ubiquiti's inadequate executive and Board composition also puts all-the-more

responsibility on Pera's shoulders as CEO to manage the Company's operations that were not being properly overseen by others.

85.    The following chart based on Ubiquiti's annual proxy statements shows the Company's slim executive officer ranks since 2013:

| Date (as of) | Chief Executive Officer | Chief Financial Officer | Chief Accounting Officer ("CAO") | Chief Technology Officer | Vice President of Business Development | Chief Marketing Officer |
|---|---|---|---|---|---|---|
| October 28, 2013 | Robert Pera | Craig Foster[4] | ***None*** | John Sanford | Benjamin Moore | David Hsieh (departed November 2013) |
| October 28, 2014 | Robert Pera | Craig Foster (resigned April 21, 2015) | ***None*** | John Sanford | Benjamin Moore | ***None*** |
| October 27, 2015 | Robert Pera | ***None*** | Mark Spragg (Interim, as of August 4, 2015)[5] | ***None*** | Benjamin Moore | ***None*** |
| October 27, 2016 | Robert Pera | ***None*** | Kevin Radigan (as of May 3, 2016) | ***None*** | Benjamin Moore | ***None*** |
| October 27, 2017 | Robert Pera | ***None*** | Kevin Radigan | ***None*** | Benjamin Moore | ***None*** |
| October 26, 2018 | Robert Pera | ***None*** | Kevin Radigan | ***None*** | Benjamin Moore (departed October 10, 2018) | ***None*** |

[4] Prior to Foster, John Ritchie resigned as the Company's CFO in February 2013.  Ritchie was replaced by Foster, who began his position as CFO on March 4, 2013.  Foster then resigned just over two years later, on April 21, 2015.

[5] Ubiquiti outsourced the job of Interim CAO to Spragg through FTI Consulting, a consulting company that provided "interim management services" to Ubiquiti because Ubiquiti itself utterly lacked internal controls.

86.     The Company has failed to hire and retain financial officers with the level of experience required for a multi-billion-dollar public company.  When Foster resigned in April 2015, Ubiquiti stated that it was conducting a search for a new CFO.  It never filled that position.

87.     Ubiquiti also announced upon Foster's departure that Rohit Chakravarthy would serve as the Company's  principal financial officer and principal accounting officer on an interim basis.  The theft of $46.7 million immediately followed.  Chakravarthy then promptly resigned on August 4, 2016, just before Ubiquiti announced the theft, and was replaced on an interim basis by Defendant Spragg.

88.     On the Company's earnings conference call held on August 6, 2015, the day Ubiquiti announced that Spragg would replace Chakravarthy, an analyst asked Pera if the Company was continuing to search for a permanent CFO, or if it was  "putting that on hold until you get through the forensics" of the $47 million fraud and related internal control failures.  Pera responded, "[n]o, we're doing both in parallel. So FTI is working with us on a temporary basis, and in parallel we're looking for outstanding financial accounting people to enhance the team."

89.     As the Citron Report noted, however, the Company had a European CFO whose LinkedIn profile did not list her real name. That page has since been taken down or moved from the location to which it was linked in the Citron Report.

90.     In addition, the Citron Report detailed many other departures of directors and several high-level employees from Ubiquiti during the Class Period, noting the extraordinarily large number of departures from the Company's finance and audit functions and the brief tenures of these individuals at the Company.[6]  For example, Ubiquiti's longtime Chief Technology Officer, John Stanford, left the Company in 2016 without a disclosure of his departure and

---

[6] *See* "Corporate Turnover Chart" from the Citron Report (*available at* https://citronresearch.com/wp-content/uploads/2017/09/corporate-turnover.pdf (*last accessed* December 21, 2018)).

without ever having been replaced since that time.  Ubiquiti also eliminated the position of Chief Marketing Officer during the Class Period.

91.    Between October 2015 and the end of the Class Period, Ubiquiti's only executive officer in addition to Defendant Pera and the Company's rotating Chief Accounting Officers, was its Vice President of Business Development, Benjamin Moore.  Moore was only 31 or 32 years old when he began serving as Ubiquiti's Vice President of Business Development in May 2008.  The only jobs that Moore held before joining Ubiquiti were as a manager at an antenna design company and at that company's subsequent acquirors.  Moore abruptly resigned from Ubiquiti on October 10, 2018—after just one month's notice—"to pursue other opportunities."

92.    In addition to having an insufficient executive team in place, Ubiquiti has had insufficient Board oversight its whole time as a public company.  From December 2012 to October 2013, all but one of Ubiquiti's outside directors resigned.  One of those directors  chose to leave after just nine months on the Board and four of the remaining five outside directors all resigned together in October 2013.

93.    Rather than replace all of these directors, Pera reduced the number of outside directors on the Board to just three.  Since that time, the Board has had only the minimum of three outside directors, even though nearly all public companies of its size have more Board members.  Moreover, since the time that Defendant Foster resigned from the Company in April 2015, Pera has been the only other director on the Board.

94.    These thin executive and Board roles gave Pera far more responsibility than CEOs at other companies, where authority is more dispersed among larger executive or management teams.  It also made Ubiquiti's Board uniquely controlled by Pera, who is also the Company's CEO, majority shareholder, and founder.  As Morningstar noted in an October 2, 2017 analyst

report, "[g]iven his influence as founder, CEO, and chairman, we are concerned that the board contains only three independent directors—an inadequate total, in our view."

95.     Moreover, Ubiquiti failed to fulfill even its minimum requirement for eight months following a Board member's resignation on December 16, 2015, when the Company's Audit Committee did not meet the requirement of having at least three independent directors.

96.     After a new outside director finally joined Ubiquiti's Board in August 2016, the same three outside directors have all served on the Company's Audit, Compensation, and Nominating and Governance Committees from that time to the present.  Since that time, Ubiquiti's only other Director has been Pera.

### C.     Ubiquiti's Implausible "Disruptive Business Model" Based on the Ubiquiti Community

97.     Ubiquiti attributes its financial performance to what it calls its "disruptive business model."  This refers in part to Ubiquiti's low expenditures on sales and research and development costs.

98.     But, as Ubiquiti tells investors, "[t]he markets for networking solutions for service providers, enterprise WLAN, video surveillance, microwave backhaul,[] machine-to-machine communications technology[, and consumer markets] are highly competitive."  The Company also lists specific competitors in each of the markets that it participates in and notes that "[w]e expect increased competition from other established and emerging companies if our market continues to develop and expand."

99.     Ubiquiti further explains that "*A number of our current or potential competitors have longer operating histories, greater brand recognition, larger customer bases and significantly greater resources than we do*. . . . Potential customers may prefer to purchase from their existing suppliers or well-known brands rather than a new supplier, regardless of product

performance or features. . . .   Many of these companies have significantly greater financial, technical, marketing, distribution and other resources than we do and are better positioned to acquire and offer complementary products and technologies." (Emphasis in original.)

100.   Market analysts have also noted the steep competition that Ubiquity faces.  For example, SunTrust Robinson Humphrey stated in a May 26, 2015 Sector Update: "We think that competition in the WISP market has increased with MikroTik fighting back to capture lost share in addition to new entrants such as Mimosa that offer compelling solutions quite often at a lower price point."

101.   Ubiquiti attributes its financial performance despite these obstacles to its focusing on meeting "the key needs of underserved and underpenetrated markets. Our products and solutions are designed to meet the price-performance characteristics demanded by our customers to achieve a strong overall return on their investment."  Ubiquiti cites its "[p]rice disruptive offering," which "enable service providers and enterprises to deliver high performance to their users at highly disruptive price points," as one of the four "key benefits" of its products and services.  In other words, Ubiquiti acknowledges that its products are not necessarily the best quality available, but balance price against performance based on the preferences of "underserved and underpenetrated markets" around the world.  The following slide from the Company's February 2017 Investor Presentation (which was filed with the SEC and filed again after it was updated slightly several times after February 2017) demonstrates this approach:



102.   Ubiquiti claims that these factors contribute to the "unusual combination" of the Company's being "highly profitable" through its "disruptive business model":



103.   A key component of Ubiquiti's "disruptive business model" that the Company claims allows it to overcome its lack of traditional resources is "the Ubiquiti Community, a

global, grass-roots community of . . . entrepreneurial operators and systems integrators who engage in thousands of on-line forums at http://www.ubnt.com." The Company describes the Ubiquiti Community as "central to the success of our business."

104.   The Company describes its "business model [as] driven by a large, growing and highly engaged community of service providers, distributors, value added resellers, systems integrators and corporate IT professionals, which we refer to as the Ubiquiti Community. The Ubiquiti Community is a critical element of our business strategy as it enables us to drive" "[r]apid customer and community driven product development"; a "[s]calable sales and marketing model"; and "[s]elf-sustaining product support." According to Ubiquiti, "[b]y reducing the cost of development, sales, marketing and support we are able to eliminate traditional business model inefficiencies and offer innovative solutions with disruptive price performance characteristics to our customers."

105.   Ubiquiti describes its "[s]calable community-led approach" as one of the four "key benefits" that it offers customers. According to Ubiquiti, "[t]his scalable community-led approach to customer support contributes to the lower total cost of ownership of our products and solutions relative to incumbent providers."

106.   Ubiquiti also attributes other aspects of its business strategy to the Ubiquiti Community. For example, the Company states that it has a "differentiated business model" that is "powered by the Ubiquiti Community, [which] provides us with a significant and sustainable competitive advantage over competitors."

107.   Ubiquiti claims that its Community provides "customer-driven feedback" that allows the Company to "deliver products and solutions with disruptive price-performance characteristics that are specifically targeted to our markets."

108.   In addition, according to Ubiquiti, "[t]he Ubiquiti Community facilitates streamlined and efficient product development coupled with a highly efficient sales and distribution model that allows us to avoid the costs associated with expensive direct and channel organizations. The self-sustaining product support aspect of the Ubiquiti Community simplifies the deployment process and provides a highly effective real-time support system for customers."

109.   Ubiquiti also states that it relies on its Community to provide "viral marketing" that supplants traditional marketing efforts: "We rely on the Ubiquiti Community to drive market awareness and demand for our products and solutions. This community-propagated viral marketing enables us to reach underserved and underpenetrated markets far more efficiently and cost effectively than is possible through traditional sales models."

110.   Until recently, Ubiquiti also focused on the size of the Ubiquiti community.  The Company boasted that its Community included over 4 million members and noted that the level of support from the Community was "driven by the size and engagement of our customer base."

111.   On February 9, 2017, Ubiquiti announced its second quarter 2017 financial results in a press release that stated that Ubiquiti's "growth is supported by the Ubiquiti Community, a global grass-roots community of 4 million entrepreneurial operators and systems integrators who engage in thousands of forums."

112.   Ubiquiti repeated this statement multiple times in its periodic SEC filings, through its 2017 Form 10-K, filed on August 25, 2017. That 10-K increased the size of the Ubiquiti community, describing it as "a global, grass-roots community of over 4 million entrepreneurial operators and systems integrators who engage in thousands of on-line forums."

113.   The following slides from Ubiquiti's February 21, 2017 investor presentation (updated on August 10, 2017) also claimed that the "Ubiquiti Community" contained "4 million

registered users."  The following slides show that Ubiquiti described the Community as a "Core Competitive Advantage" and as central to the Company's "Disruptive Business Model."  The "advantages" of the Community included "[h]ighly engaged and loyal evangelists."  The "[s]calable and self-sustaining" Community served as a driver of awareness that "avoids traditional sales force" and provides real-time R&D feedback that leads to "faster, lower cost product development."







114.   In addition, these presentations claimed that partly  because of the sales force

savings derived from the Ubiquiti Community, the Company's operating expenses were just 12%

of sales, as compared to being 20% to 90% of sales for the Company's peers, which it listed as

including well-established players such as Cisco, Juniper, and Netgear, as well as Aerohive, Arista, Arris, A10, Avigilon, Brocade, CalAmp, Fortinet, HPE, Infinera, and MSI.

115.   These presentations also listed the Company's ability to "[c]ontinue to grow [its] powerful user community" as a key to its future success.

116.   Investors have bought into Ubiquiti's description of its business model.  As Morningstar explained in an investment thesis from March 2017; "Ubiquiti's business model is centered on delivering well-engineered, but not so well-tested, products at extremely attractive price points. . . .  A bare-bones organizational structure, which mostly lacks sales and marketing and has a frugal approach to research and development expenses, allowed the firm to drop prices on its wireless equipment far below competitors'. This unorthodox business model rests upon cultivation and heavy reliance on its online community of dedicated customers; the company fosters collaboration between its engineers and active community members. Moreover, Ubiquiti relies on the community for technical support and evangelization of its products. . . .  Ultimately, we think the firm's rock-bottom pricing and close collaboration with its customers are working." Morningstar described the Company as "laser-focused on the lower end of the market."

117.   Morningstar further explained that "Ubiquiti's frugal operating expense strategy and strategic approach to leveraging its user community has yielded phenomenal profitability for a pure hardware vendor, as the firm earned a 34% operating margin in 2017. . . . The company's minimalist cost structure allows it to undercut the traditional networking equipment vendors by a wide margin. Operating expenses are almost solely focused on research and development (9% of sales), while selling, general, and administrative expenses account for less than 4% of sales. Instead, the firm relies on community-based technical support, presale Q&A, and a word-of-mouth marketing approach."

118.   The Citron Report, published on September 18, 2017, began to show that the Company had been misrepresenting the size Ubiquiti Community.  The report showed how each registered user was given a unique user ID that appears in the URL (a/k/a web address) of their profile page. For example, a user who registered in June 2017 received the user ID 643002, which tied to a web page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/643002.

119.   The Citron Report showed that the user IDs are issued sequentially.  For example, a user ID registered in 2007 had user ID 94, and a profile page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/94.

120.   The Citron Report also showed that Ubiquiti Community user IDs ended at about 710,000 – far less than the 4 million that the Company had been reporting.  According to Citron, anyone searching for a profile on a user ID higher than 720,000 would see a message stating that the "[p]erson does not exist."[7]

121.   Ubiquiti Community members can post in online message boards. Yet, Citron also reported that "97% of accounts never post. In an analysis of 11,250 recently registered accounts, 10,910 out of 11,250 (96.97%) never posted a single message on the forum. This is remarkable given that all the forum material is available without registering an account and the only apparent benefit to registering is the ability to post."

122.   Citron also determined that only 30 "super-users" accounted for approximately 20% of all posts in the Ubiquiti Community.  But only one of these contributors that Ubiquiti values so highly had registered since 2013.  This limited nature of the Ubiquiti Community undermined the Company's claim that it was a "global grass-roots community of 4 million entrepreneurial operators and systems integrators who engage in thousands of forums."

---

[7] As of the end of February 2018, when the initial complaint in this matter was filed, the number had risen so that User IDs higher than approximately 862,400 generated a "Person does not exist" message.  As of December 23, 2018, the number had risen to at least 1,176,440.

123.   Indeed, detracting even further from the Company's characterization of its Community, Citron concluded, based in part on the analysis of a financial blogger, that the majority of the approximately 700,000 accounts that actually existed were bots.

124.   In addition to having misstated the Ubiquiti Community's metrics, the whole idea that the Community consists of organic "evangelical" supporters of the Company's products that can replace the role of a more traditional sales and marketing department is fanciful.  As the Citron Report rightly asks, "[a]re people so passionate about their home router that they are telling all of their friends and staying up at night helping other people set up their routers? Do people get 'evangelical' about their access point in their homes? Apple has the most evangelical of all user bases — why wouldn't Apple just close its genius bar?"

125.   Following Citron's exposure, the Company admitted that it had inflated the size of the Ubiquiti Community.  In a Form 8-K filed November 9, 2017, signed by Defendant Pera, the Company stated that—consistent with Citron's analysis—in actuality, there were only about 609,000 registered users in the Ubiquiti Community—not the 4 million that the Company had repeatedly reported.  According to Ubiquiti:

> As a result of a reporting error, the previously furnished Prior Investor Presentations and the investor presentation used by Company management dated as of May 2017 referenced 4 million registered users in the Ubiquiti Community, and the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2017 reported that the Ubiquiti Community included over 4 million entrepreneurial operators and systems integrators. In actuality, as of December 31, 2016, the Ubiquiti Community included approximately 609,000 registered users, while there were approximately 4 million registered user sessions at https://community.ubnt.com during the calendar year ended December 31, 2016. The information on https://community.ubnt.com is not part of this Current Report on Form 8-K.

126.   This explanation for the source of the "mix up" does not make sense.  First, it does not account for the fact that of the accounts that actually existed, the majority of them were just bots rather than accounts created by real people.

34

127.   Second, Ubiquiti's prior description of there being over 4 million members of the Community covered the entirety of the Community, not just the number of users that registered "during the calendar year ended December 31, 2016."

128.   Third, months after initially reporting the 4 million figure in February 2017, Ubiquiti released an "updated" investor presentation on August 10, 2017 that contained the same error.  Ubiquiti then updated that figure again a few weeks later in 10-K for 2017, issued on August 25, 2017, when it increased the size of the Community to containing *over* 4 million members.  It strains credulity to suggest that the Company continued to make the same flagrant error as it updated its figures in preparation for its year-end disclosures.

129.   Fourth, the "investor presentation" described above that had been released on February 21 and updated on August 10, 2017 gave several additional metrics related to the Ubiquiti Community, including the number of Forum posts (1.3 million) and several statistics for 2016 (including the number of "active user sessions (11 million), active member visits (3 million), and new members registered (173,000)), among other figures.  When Ubiquiti announced on November 9, 2017 that it had misstated the number of Community members, it also released a revised version of this presentation.  In addition to removing the reference to there being "4 million registered users globally," this revised presentation changed its characterization of several other figures that had been reported previously.  What had previously been described as "[a]ctive user sessions" was now described as "[a]ll user visits," including "anonymous and registered users"; "[a]ctive member visits" now became "[r]egistered user visits"; and "new members registered" now became "[n]ew registered users."  In addition, Ubiquiti now explained that whereas these figures were for calendar year 2016, the number of forums and stories listed on the slide (adjacent to where it used to say 4 million registered users)

were "[c]umulative as of December 31, 2016." The level of detail that the Company provided in this investor presentation related to metrics for the Ubiquiti Community, as well as the extent of revisions that were required after its misrepresentation of the number of members was exposed, indicate that the Company's initial misstatement was not merely the inadvertent oversight that Pera and Ubiquiti claimed it to be.

130. But Ubiquiti's correction of its blatant misstatement concerning the size of the Ubiquiti Community did not end the matter. Even after the November 9, 2017 revelation that Ubiquiti had misstated the size of the Community, Defendants continued to tout the importance of the Ubiquiti Community to the Company's business model. (*See infra* ¶¶ 250-52).

131. The Company's February 20, 2018 announcement of the SEC's investigation into Ubiquiti's business practices ultimately revealed that "metrics relating to the Ubiquiti Community" is an area of focus for the SEC.

**D.**     **Misstated Accounts Receivables and Ubiquiti's Relationships With Its Distributors**

132. The Citron Report also cited evidence that Ubiquiti's SEC filings were deceiving investors for years about the Company's accounts receivable because the amount of accounts receivable that Ubiquiti reported were repeatedly inconsistent with the amount of trade payables that Ubiquiti's distributors reported in their own filings.

133. Accounts receivable refer to amounts that a company is owed for goods that it has sold but for which it has not yet received payment. Accounting Standards Codification Section 310, *Receivables*, explains that receivables are what "may arise from credit sales, loans, or other transactions," and "may be in the form of loans, notes, and other types of financial instruments and may be originated by an entity or purchased from another entity." (ASC 310-10-05-4.) Trade receivables, specifically, arise from transactions whereby an entity has sold goods (or services) in its primary line of business, but for which payment has not yet been received.

134. A "trade payable," on the other hand, is an accounting figure that reflects a company's short-term obligation to pay its suppliers for goods that the company purchased but has not yet paid for. A purchaser's trade payables is therefore a corollary of a seller's accounts receivable for the goods at issue.

135. GAAP requires that receivables be measured periodically to ensure that the amounts at which they are being carried on an entity's balance sheet are commensurate with and reflective of the extent to which such receivables are expected to be collected because, as the guidance provides, "[t]he conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case a contingency exists." (ASC 310-10-35-7.)

136. GAAP requires that a company take a loss on an account receivable when "it is probable that an asset has been impaired at the date of the financial statements" and "[t]he amount of the loss can be reasonably estimated." (ASC 310-10-35-8.) This is required even if "the particular receivables that are uncollectible may not be identifiable." (ASC 310-1-35-9.) Under GAAP, companies must therefore regularly and methodologically assess the collectability of their receivables at each reporting date.

137. Because of the discrepancy between the accounts receivable that Ubiquiti reported and the lower amount of trade payables that certain of its top distributors reported, Ubiquiti, at best, could not have reasonably expected to collect on the receivables it reported to have existed from those distributors. These discrepancies also raise the possibility that Ubiquiti did not actually sell the goods at issue to these distributors in the amounts that Ubiquiti reported that it had.

138. Defendants were well aware of channel management problems with its distributors. The flow of Ubiquiti's products through its distributors has always been murky.

Ubiquiti often reported volatile financial results from quarter to quarter and blamed those changes on difficulties with managing inventory with its distributors.  On May 5, 2017, Morgan Stanley published a report about Ubiquiti titled, "Visibility Remains Issue."  This report explained that "Ubiquiti sells through two-tiered distribution, clouding ability to explain end customer demand."

139.   Defendants, however, attempted to reassure investors that they should not be concerned about this issue.  As reported by SunTrust Robinson Humphrey in a May 26, 2015 Sector Update, "Ubiquiti indicated that 90% of its distributors report on sell-through inventory once a month. We think that incremental information could give the company an opportunity to improve its communications with the investment community and ease some of the visibility fears."  Parroting the Company's assurances, SunTrust also concluded, in a separate note dated August 6, 2015, based on this information from the Company, that "[w]e think that visibility has improved with almost 90% of distributors reporting sell-through inventory once a month (see our note 'Wireless Bus Tour') easing some investor concerns."

140.   SunTrust also raised the possibility in its May 26, 2015 Sector Update that Ubiquiti engaged in channel stuffing.  Although SunTrust rejected this possibility based on information purportedly known at that time, that type of improper accounting practice would explain the discrepancy between Ubiquiti's reported accounts receivable and its distributors' trade payables (i.e., it raises the specter that what Ubiquiti was reporting as "sales" transactions did not actually qualify as such).

141.   Given the importance of Ubiquiti's distributors to the Company's business model, the Company should have confirmed—as they told SunTrust they were already doing in 2015— that the figures that they reported in the Company's financial statements were accurate and in

conformity with the accounting rules (namely, GAAP). This includes ensuring that the Ubiquiti's financial disclosures accurately reflected its transactions and activity with distributors, such as in the Company's accounts receivable. Yet, throughout the Class Period, Ubiquiti overstated its accounts receivable for various customer relationships. Ubiquiti therefore violated GAAP by failing to properly reduce the carrying value of such assets.

142. In particular, Ubiquiti's quarterly report on Form 10-Q, filed on May 9, 2013 with the SEC, announced the Company's financial and operating results for the quarter ended March 31, 2013. Among other things, the Company disclosed in this filing an accounts receivable balance as of June 30, 2012 of $75.6 million:

### UBIQUITI NETWORKS, INC.
#### Condensed Consolidated Balance Sheets
#### (In thousands, except share data)
#### (Unaudited)

|  | March 31, 2013 | June 30, 2012 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $     181,689 | $     122,060 |
| Accounts receivable, net of allowance for doubtful accounts of $2,700 and $1,266, respectively | 38,417 | 75,644 |
| Inventories | 19,381 | 7,734 |
| Current deferred tax asset | 882 | 882 |
| Prepaid expenses and other current assets | 3,269 | 1,577 |
| Total current assets | 243,638 | 207,897 |
| Property and equipment, net | 6,178 | 4,471 |
| Long-term deferred tax asset | 232 | 232 |
| Other long–term assets | 1,775 | 1,136 |
| Total assets | $     251,823 | $     213,736 |

143. This May 9, 2013 Form 10-Q also listed distributors with whom Ubiquiti had receivables equaling more than 10 percent of its total outstanding receivables. In particular, Ubiquiti reported that a company it called "Customer D" accounted for 12 percent of its reported $75.6 million in receivables as of the end of the prior fiscal year (June 30, 2012), meaning that

Customer D's share of the receivable was approximately $9.072 million.

| | Percentage of Revenues | | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|---|
| | Three Months Ended March 31, | | Nine Months Ended March 31, | | March 31, | June 30, |
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Customer A | 15% | 20% | 13% | 19% | 13% | 19% |
| Customer B | * | 10% | * | * | 10% | * |
| Customer C | * | * | * | 10% | 13% | 11% |
| Customer D | * | * | * | * | * | 12% |

*denotes less than 10%*

144.   On September 13, 2013, Ubiquiti filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2013 (the "2013 10-K").  It once again disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million.

145.   The 2013 10-K once again identified customers with account balances greater than 10 percent of total accounts receivable. But, in a change from the May 9, 2013 Form 10-Q, it identified such customers by name, as follows:

| | Percentage of Revenues | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|
| | Years Ended June 30, | | | June 30, | |
| | 2013 | 2012 | 2011 | 2013 | 2012 |
| Flytec Computers, Inc. | 13% | 16% | 20% | 12% | 19% |
| P.W. Batna Magdalena Mucha | * | * | * | 11% | * |
| Streakwave Wireless, Inc. | * | 10% | 15% | 15% | 11% |
| Discomp | * | * | * | * | 12% |

*denotes less than 10%*

146.   Accordingly, the customer with 12 percent of Ubiquiti's accounts receivable balance as of June 30, 2012 – previously referred to as "Customer D" – was actually called Discomp.   According to its web site, www.discomp.eu, Discomp is a vendor of computer networking equipment in the Czech Republic.

147.   Discomp's financial statements as of the same date show that the company reported, in a filing for the Czech government, a total "trade payable" of only approximately

40

$3.43 million in 2012 (and $2.16 million in 2011).[8]

148.   The $9.072 million receivable that Ubiquiti reported is inconsistent with the total $3.43 million that Discomp reported.

149.   This large discrepancy between what Ubiquiti reported for accounts receivable from Discomp and Discomp's reporting of its own "trade payable" was not an isolated occurrence.

150.   On August 21, 2015, Ubiquiti filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015 (the "2015 10-K"), reporting, among other things, a total of $66.1 million in receivable as of that day:

### UBIQUITI NETWORKS, INC.
#### Consolidated Balance Sheets
#### (In thousands, except share data)

| | June 30, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $     446,401 | $     347,097 |
| Accounts receivable, net of allowance for doubtful accounts of $1,071 and $1,395, respectively | 66,104 | 54,871 |
| Inventories | 37,031 | 46,349 |
| Current deferred tax assets | 1,535 | 884 |
| Prepaid income taxes | 2,566 | 3,256 |
| Prepaid expenses and other current assets | 27,709 | 13,267 |
| Total current assets | 581,346 | 465,724 |
| Property and equipment, net | 15,602 | 7,260 |
| Long-term deferred tax assets | 1,515 | 1,255 |
| Other long–term assets | 2,109 | 1,912 |
| Total assets | $     600,572 | $     476,151 |

151.   Ubiquiti once again disclosed distributors with receivable balances greater than 10

---

[8] Discomp's financial statements are discussed in a September 6, 2017 report by the prominent financial blogger Unemon and relied on by the Citron Report (*available at* https://seekingalpha.com/instablog/6460311-unemon/5037651-ubnt-found-re-accounts-receivables-perplexing).

41

percent of the Company's total reported accounts receivable. In the chart below, it disclosed that a distributor called P.W. Batna Magdalena Mucha ("Batna") accounted for 12 percent of the receivables as of that date – meaning that Batna's share of total reported accounts receivable was approximately $7.93 million.

| Percentage of Revenues | | | | Percentage of Accounts Receivable | |
| --- | --- | --- | --- | --- | --- |
| | Years Ended June 30, | | | June 30, | |
| | 2015 | 2014 | 2013 | 2015 | 2014 |
| Flytec Computers, Inc. | * | 13% | 13% | * | 13% |
| Streakwave Wireless, Inc. | * | * | * | 13% | 12% |
| P.W. Batna Magdalena Mucha | * | * | * | 12% | 12% |
| *denotes less than 10%* | | | | | |

152.   On  February 4, 2016, Ubiquiti filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2015, disclosing, among other things, that it had accounts receivable of $64.6 million as of December 31, 2015.  In addition, this filing reiterated Ubiquiti's $66.1 million receivable figure that the Company had previously reported as of June 30, 2015.

153.   In the Company's February 4, 2016 10-Q, Ubiquiti stopped reporting the names of customers with receivable balances greater than 10 percent of the total accounts receivable. Instead, Ubiquiti reverted to using pseudonyms for such customers. Specifically, Ubiquiti identified "Customer C" as accounting for 12 percent of the June 30, 2015 accounts receivable (or approximately $7.9 million) and 14 percent of the December 31, 2015 accounts receivable:

| | Percentage of Revenues | | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|---|
| | Three Months Ended December 31, | | Six Months Ended December 31, | | December 31, | June 30, |
| | 2015 | 2014 | 2015 | 2014 | 2015 | 2015 |
| Customer A | 13% | 12% | 11% | 11% | * | * |
| Customer B | * | 13% | * | 11% | * | 13% |
| Customer C | * | * | * | * | 14% | 12% |
| Customer D | * | * | * | * | 15% | * |

*denotes less than 10%*

154.  Because Batna represented 12% of total accounts receivable as of June 30, 2015, it follows that Batna is "Customer C."

155.  Ubiquiti further reported in its February 4, 2016 Form 10-Q that the total accounts receivable as of December 31, 2015 were $64.6 million.  The 14 percent of the $64.6 million total attributable to Batna was, accordingly, approximately $9.04 million.

156.  Batna is headquartered in the Polish city of Czestochowa. It also sells computer networking equipment.

157.  According to Batna's audited financial statements, it had total "Trade Payables" of $2.746 million as of December 31, 2015.  Once again, Ubiquiti's statements about its largest customers' outstanding receivables were inconsistent with the customers' own public statements.[9]

158.  A further discrepancy exists when analyzing Ubiquiti's revenue figures. According to Ubiquiti's SEC filings, a company called Flytec Computers, Inc. was Ubiquiti's largest customer for 2011, 2012, 2013, and 2014.  Osni Arruda, Flytec's founder and President, states on his LinkedIn page (as translated from Portuguese) that from the time he founded Flytec

---

[9] Batna's financial statements are discussed in a September 6, 2017 report by the prominent financial blogger Unemon and relied on by the Citron Report (*available at* https://seekingalpha.com/instablog/6460311-unemon1/5037651-ubnt-found-re-accounts-receivables-perplexing).

Computers, Inc. in 2007 until just four years later (i.e., in 2011), he built the company to the point where it had annual sales of $3.3 million.[10]  Ubiquiti, however, reported that in its fiscal 2011 and 2012, Flytec Computers Inc. accounted for 20% and 16% of Ubiquiti's total revenue, respectively.  Ubiquiti also reported in its 2012 annual report that for the year ended June 30, 2011, the Company had approximately $198 million in total revenues, and for the year ended June 30, 2012, the Company had approximately $354 million in total revenues.  Flytec therefore would purportedly have accounted for between $40 and $50 million of Ubiquiti's total revenue in the calendar year 2011.  This means that Flytec's purchase of over $40 million of goods from Ubiquiti resulted in just $3.3 million in annual sales for Flytec in 2011.  Such a relationship is entirely illogical and financially untenable, particularly because Flytec continued to purchase a large amount of additional goods from Ubiquiti in the years that followed.  This vast difference between the amount of revenue that Ubiquiti attributed to Flytec and the amount of sales that Flytec's founder and President reported shows another discrepancy in Ubiquiti's key financial disclosures.

159.    Ubiquiti reported that Flytec continued to be Ubiquiti's top distributor through at least Ubiquiti's fiscal 2014.  In 2016, Ubiquiti stopped reporting the names of companies that accounted for over 10% of its total revenues, and started referring to them anonymously.[11]  Investors thus have no way of knowing whether the Ubiquiti's improper relationship with Flytec

---

[10] *Available at*: https://www.linkedin.com/in/osniarruda/.

[11] In 2017, Ubiquiti reported one anonymous company ("Company C") as accounting for 11% of its total revenue.  In 2018, Ubiquiti reported a separate company ("Company A") as accounting for 11% of its total revenue.  That Company A appears to be Batna.  That same Company A also represented 12% of Ubiquiti's accounts receivable in 2017 and 2018.  Ubiquiti's 2017 and 2016 annual filings, in turn, show that the only company that represented 12% of Ubiquiti's accounts receivable in 2017, represented 13% of its accounts receivable in 2016 and 12% in 2015.  The only company that represented 12% of Ubiquiti's accounts receivable in its 2015 annual filing is Batna.

continues in the same capacity to this day.

160.   In addition to showing misstatements in Ubiquiti's financial statements, this evidence is part of a broader concern with the legitimacy of Ubiquiti's distributors around the world.

161.   The few distributors that Ubiquiti has discussed by name have questionable histories.  From 2012 through 2015, the only companies that Ubiquiti has reported in its annual reports as representing over 10% if its revenues were Flytec and Streakwave Wireless Inc. ("Streakwave").  Flytec and Streakwave also accounted for over 10% of Ubiquiti's accounts receivable balance during that time.[12]

162.   As noted above, after 2015, Ubiquiti stopped reporting by name the companies that accounted for over 10% of its revenues and accounts receivable balance.  Moreover, at not point during the Class Period did Ubiquiti report the names of any distributors that accounted for less than 10% of its revenues and accounts receivable balance, regardless of how substantial that business might have been within that threshold.

163.   As the Citron Report explained, Flytec's founder and President, Osni Arruda, was arrested in Brazil in 2006 for "alleged crimes of embezzlement, forgery of private documents, misrepresentation, use of false documents and conspiracy"—including the smuggling of electronics equipment in Paraguay.

164.   Streakwave, the only other top distributor that Ubiquiti has mentioned by name in its annual reports other than Flytec and Batna, has several connections to Benjamin Moore, who was Ubiquiti's Vice President of Business Development until October 10, 2018.   As

---

[12] In Ubiquiti's fiscal 2012 through 2014, Flytec represented 16%, 13%, and 13% of Ubiquiti's revenues and 19%, 12%, and 13% of Ubiquiti's accounts receivable balance, respectively.  In 2012, Streakwave represented 10% of Ubiquiti's revenues.  In 2012 through 2015, Streakwave represented 11%, 15%, 12%, and 13% of Ubiquiti's accounts receivable balance, respectively.

demonstrated by Unemon, a popular financial blogger, Benjamin Moore's brother and two of Moore's associates from before the time that he joined Ubiquiti have been involved with Streakwave.[13]

165.   Ubiquiti disclosed in its Schedule 14A proxy statement filed on October 26, 2018, that during fiscal 2018, Benjamin Moore acquired approximately 1.3 million shares of Ubiquiti stock through his exercise of stock options, for a total value of approximately $92 million. Moore had also earned millions of dollars from his sale of Ubiquiti stock earlier in his tenure at the Company (*see infra* ¶ 184).  He and Defendant Pera were Ubiquiti's only executive officers that remained in place for the duration of the Class Period.

166.   This undisclosed personal relationship between Pera's righthand man and one of Ubiquiti's top distributors also shows the improper nature of Ubiquiti's interactions with its distributors.

167.   Beyond the select distributors that Ubiquiti discloses as accounting for over 10% of the Company's revenue, it has disclosed vaguely throughout the Class Period that "[a]lthough we have a large number of distributors in numerous countries who sell our products, a limited number of these distributors represent a significant portion of our sales."  The questionable circumstances surrounding these key parties that sustain Ubiquiti's business show that improper dealings with these parties are a far more likely explanation for Ubiquiti's financial performance than its supposedly "disruptive business model."

168.   The Citron report concluded that Ubiquiti engages "shady distributors" to do "business in sanctioned countries and jurisdictions notorious for money laundering."    In particular, the Citron report cited sources suggesting that even after U.S. regulators informed Ubiquiti that its products were being sold into prohibited countries such as Iran, Cuba, and North

---

[13] http://unemon.com/ResearchEasy/201806_UBNT/20180625_UBNT_Streakwave.html.

Korea—and after Defendant Pera had stated in late 2011 that "[w]e didn't have the controls in place that we should. . . . It can't happen again. If it does, I'll be in a lot of trouble"—Ubiquiti's distributors and resellers were still selling its products to those banned locations.

169.   Moreover, every year during the Class Period, at least 60% of Ubiquiti's sales were made to foreign countries.  In addition, because nearly all of Ubiquiti's sales are through distributors, an even larger portion of the Company's products might end up in different countries around the world than the "ship-to destinations" that the Company tracks.

170.   At best, given Pera's deliberate choice to shirk the Company's compliance responsibilities, Ubiquiti has turned a blind eye to its distributors' sales to international parties and other problematic business practices.  In addition, at no time during the Class Period did Ubiquiti disclose that its relationship with its distributors and related accounting practices had a high likelihood of being—or already were—subject to governmental regulatory activity.

171.   Then, the Company's disclosure of the SEC subpoenas in February 2018 revealed that the SEC was investigating precisely those topics, including Ubiquiti's "accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties."

**E.      Pera's Control of the Company and Insider Sales**

172.   Although Ubiquiti is a publicly traded company, Defendant Pera has owned the vast majority of the Company's shares since the time that it became a public company in 2011.

173.   Pera's share of the Company's stock has progressively increased over the course of the Class Period, from approximately 63% to over 70%, as the Company has bought back hundreds of millions of dollars of shares while allowing Pera to net tens of millions of dollars in gains from his sale of stock.

174.   From   Ubiquiti's   fiscal   2013   through   September   2018,   it   repurchased

approximately $594 million worth of common stock and had the ability to repurchase approximately an additional $400 million of common stock under pending repurchase programs.[14]

175.   These constant stock buybacks have allowed the Company to artificially inflate its stock price—and the value of Defendant Pera's ownership interest in the Company—even as bad news about the Company's operations came out during the Class Period.

176.   These repurchases also allowed Pera to increase his level of ownership in the Company even as he sold substantial amounts of stock for his personal benefit.  In particular, on August 28, 2017, just before the Citron Report was released, Pera sold one million shares of stock at $61.25 per share, for net proceeds of $61.25 million.

177.   Pera also sold 500,000 shares on June 10, 2013, at $16  per share, for net proceeds of $8 million.

178.   In addition, in November 2013, Ubiquiti entered into an aircraft lease agreement with a company owned by Pera.  The Company recognized a total of approximately $1.6 million, $2.1 million, $1.3 million, $0.4 million, $0.3 million in expenses under that agreement during its fiscal 2018 through 2014, respectively.

179.   Defendant Pera also had an interest to keep the value of the Company inflated in the near term because of his other financial interests.  He is the lead owner of the Memphis Grizzlies National Basketball Association team.  Pera led a group that bought the team in 2012. His ownership agreement with certain of his co-owners contained a provision that allowed them, starting in October 2017, to invoke a clause that would force a negotiation that would result in one side buying the other out.  Pera's co-owners invoked that clause in November 2017.  In April

---

[14] These repurchases occurred as follows: $54.4 million in fiscal 2013;  $34.7 million in fiscal 2015; $200 million in fiscal 2016; $98.7 million in fiscal 2017; $93.8 in fiscal 2018; and $112.8 in the first quarter of fiscal 2019.

2018, he agreed to purchase their shares at a team valuation of approximately $1.3 billion.

180.   The Company disclosed in its 2018 annual report in August 2018 that Pera financed this transaction for his increased stake in the Grizzlies by pledging up to 25% of his Ubiquiti shares "to secure loans with financial institutions," which "have or will have various requirements to repay all or a portion of the loan upon the occurrence of various events, including when the price of the common stock goes below certain specified levels.  Mr. Pera may need to sell shares of our common stock to meet these repayment requirements. Upon a default under one or more of these loans, the lender could sell the pledged shares into the market without limitation on volume or manner of sale."

181.   Furthermore, Pera told the Company that "he may in the future from time to time pledge additional shares of common stock as collateral for margin or other loans, enter into derivative transactions based on the value of our common stock, dispose of shares of common stock, otherwise monetize shares of his common stock and/or engage in other transactions relating to shares of our common stock and/or other securities of the company."

182.   As the *Financial Times* reported on August 24, 2018, Ubiquiti's stock price was inflated, notwithstanding the pending SEC investigation and other troubles, "because Pera owns 76 per cent" of the Company and "Ubiquiti spent $445 [million to repurchase 6 [million] shares in the last year, effectively reducing stock in the hands of the public by a more than a fifth." According to the *Financial Times*, viewing these events "through the lens of a man who long knew that deal was coming, . . . some might suspect [he took] actions to maximise the value of his stock to coincide with the financing. A shareholder indifferent company suddenly starts to buy back large amounts of its shares. Changes to the structure of distribution, and easier credit for customers—accounts receivable grew faster than sales last year—may have pulled sales

49

forward from the future. Sales were up 17.5 per cent in the year, to $1bn."[15]

183.   Other Ubiquiti insiders also made significant sales of Company stock during the Class Period for millions of dollars in profit.

184.   Benjamin Moore sold shares between December 2013 and September 2016 for net proceeds of approximately $15 million, including a single sale on September 15, 2016 for net proceeds of approximately $7.7 million.

185.   In addition, during his brief tenure at the Company, and shortly before he resigned on April 21, 2015, Defendant Foster sold shares on February 9, 2015 for net proceeds of over $200,000.

**F.   Ubiquiti Touted its New FrontRow Camera**

186.   In August 2017, Ubiquiti launched a new product called FrontRow that is a wearable camera built into a necklace.   Ubiquiti touted the camera at every opportunity, including through Pera's remarks at an investor conference on September 26, 2017 and when the Company released its financial results and quarterly report for the first quarter of 2018 on November 9, 2017.

187.   Ubiquiti used these disclosures starting in September 2017, including its boosting of the FrontRow camera, positive statements about its guidance for the second quarter of fiscal 2018, and the announcement of new stock buybacks, to distract investors from the Company's failings that the Citron Report revealed on September 18, 2017.

188.   Defendants, however, ignored FrontRow's terrible performance that would cause the Company's financial results for the second quarter of 2018 to fall well below the Company's guidance for that quarter.

---

[15] Dan McCrum, "Ubiquiti Networks: lawyers, regulators, grizzlies and dividends," *Financial Times*, (Aug. 24, 2018) (*available at*: https://ftalphaville.ft.com/2018/08/24/1535131668000/Ubiquiti-Networks--lawyers--regulators--grizzlies-and-dividends/).

## G.    **Additional Red Flags**

189.    The Citron Report also discussed other aspects of Ubiquiti's operations that raise suspicions about the Company's truthfulness.

190.    First, Ubiquiti's financial performance is too good to be true.  Ubiquiti has significantly higher operating margins and return on equity than its much more established competitors in the wireless networking industry, such as Cisco, Hewett-Packard, and Netgear. As noted above, Ubiquiti itself acknowledges in its annual reports that it operates in "highly competitive" industries.  Ubiquiti's level of profitability in the face of such strong competition is all-the-more unbelievable in light of its lack of managerial experience, including the fact that Pera founded the Company in 2005 when he was just 27 years old, the Company has not had a Chief Financial Officer or a Chief Technology Officer for years, and its longtime Chief Operating Officer did not have any comparable experience before being elevated to that position.

191.    Second, based on the percentage of its revenue that Ubiquiti reports coming from the United States, and applying the Company's profit margin to that revenue, the Company has far less cash in the U.S. than it should, even after accounting for stock buybacks and other uses of those profits.

192.    Third, Ubiquiti's figures for its cash held outside the U.S. do not make sense. Ubiquiti reports earning a substantially lower yield (just 0.2%) on that cash than what other technology companies earn on their non-U.S. cash.  It is implausible that if Ubiquiti truly had those funds outside the U.S., it would let them sit there without earning a reasonable return.

193.    Fourth, further evidence of Ubiquiti's poor corporate culture is that Yu-Cheng (Believe) Lin ("Lin"), who had run Ubiquiti's Taiwan operations, was charged with insider trading of Ubiquiti stock and had a default judgment entered against him on June 12, 2017.  Lin remains a fugitive in Taiwan.

51

## H.      The SEC's Investigation

194.   On February 20, 2018, Ubiquiti announced in an 8-K filing signed by Pera that "[o]n February 13, 2018, the Securities and Exchange Commission (the 'SEC') issued subpoenas to Ubiquiti Networks, Inc. (the 'Company') and certain of the Company's officers requesting documents and information relating to a range of topics, including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties. The Company is in the process of responding to the requests and intends to cooperate fully with the SEC."

195.   The breadth of this SEC investigation is astounding.   It essentially covers Ubiquiti's financial disclosures and entire business model.  It also addresses key areas where the Company had run into problems in the past but had falsely claimed to the public were resolved.

196.   Moreover, Ubiquiti failed to disclose that the SEC had been investigating these topics for a long time before it formally sent subpoenas in February 2018.   An investment research firm called Probes Reporter, run by a Chartered Financial Analyst with over 30 years of experience as a professional investor, is dedicated to investigating whether public companies are subject to undisclosed SEC investigation.

197.   According to an article that Probes Reporter published on Seeking Alpha on June 14, 2018, the SEC began investigating Ubiquiti in December 2016, if not earlier, and continued to do so over the course of 2017.[16]   Probes Reporter does not characterize an undisclosed SEC investigation as "confirmed"—as  it did with Ubiquiti—unless it has confirmed through the SEC's administrative appeals process that the company at issue is subject to an ongoing SEC

---

[16] https://seekingalpha.com/article/4181782-forget-buybacks-run-fast-run-far?page=2.

investigation.[17] Probes Reporter, however, did not learn the topics that the SEC was investigating since December 2016.  That information was revealed for the first time on February 20, 2018, when Ubiquiti disclosed the SEC's subpoenas.

198.   The evidence discussed above highlights several fundamental problems with Ubiquiti's operations, internal controls, and business model.   The fact that the SEC had been investigating those practices since December 2016 and sent extremely broad subpoenas in February 2018 shows that Ubiquiti failed to disclose at all times during the Class Period, the high likelihood that its improper practices would lead to regulatory enforcement activities—or, that after December 2016, such regulatory activity was already underway.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

199.   During the Class Period, Defendants made statements that were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to Ubiquiti's business and operations, which were known to Defendants or recklessly disregarded by them: (i) Defendants misstated Ubiquiti's accounts receivable and failed to writedown accounts receivable for distributors from whom Ubiquiti could not expect repayment; (ii) Ubiquiti lacked an effective system of internal controls over financial reporting and misstated or failed to disclose facts related to that failure; (iii) Ubiquiti's financial performance was not attributable to what Defendants characterized as the Company's "disruptive business model," but rather, was a result of the improper practices of Ubiquiti's distributors and Ubiquiti's flawed internal controls;  (iv) Defendants overstated the number of members or level of engagement of the Ubiquiti Community; (v) Ubiquiti's forecasted financial growth prospects for the second quarter and full year of its fiscal 2018 had no basis in reality because the

---

[17] https://probesreporter.com/our-research-process.

Company's inventory of its FrontRow product had become obsolete and needed to be written down; (vi) Defendants failed to disclose the Company's related party transactions with Streakwave, which was one of the Company's top distributors and was associated with Benjamin Moore's brother and two of Moore's associates from before the time that he joined Ubiquiti (vii) as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading; and (viii) the foregoing conduct was likely to—or, as of December 2016, already did—result in increased regulatory oversight, including the fact that Ubiquiti was under investigation by the S.E.C. "relating to a range of topics, including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties."[18]

---

[18] Many of Defendants' false and misleading statements described herein are contained in Ubiquiti's quarterly and annual filings with the SEC during the Class Period. From May 9, 2013 through April 21, 2015, the following periodic filings were signed, and certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), by Defendants Pera and Foster: the Company's May 9, 2013 Form 10-Q, announcing the Company's results for the quarter ended March 31, 2013 (the "May 9, 2013 10-Q"); the Company's September 13, 2013 Form 10-K, announcing the Company's results for the quarter and fiscal year ended June 30, 2013 (the "2013 10-K"); the Company's November 8, 2013 Form 10-Q announcing the Company's results for the quarter ended September 30, 2013 (the "November 8, 2013 10-Q); the Company's February 7, 2014 Form 10-Q announcing the Company's results for the quarterly period ended December 31, 2013 (the "February 7, 2014 10-Q"); the Company's May 9, 2014 Form 10-Q announcing the Company's results for the quarter ended March 31, 2014 (the "May 9, 2014 10-Q"); the Company's August 22, 2014 Form 10-K, announcing the Company's results for the quarter and fiscal year ended June 30, 2014 (the "2014 10-K"); the Company's November 6, 2014 Form 10-Q announcing the Company's results for the quarter ended September 30, 2014 (the "November 6, 2014 10-Q"); and the Company's February 5, 2015 Form 10-Q announcing the Company's results for the quarter ended December 31, 2014 (the "February 5, 2015 10-Q"). Ubiquiti's May 7, 2015 Form 10-Q announcing the Company's results for the quarter ended March 31, 2015 was signed, and certified pursuant to SOX, by Defendant Pera and Rohit Chakravarthy, the Company's Chief Accounting Officer at the time (the "May 7, 2015 10-Q"). From August 21, 2015 through February 4, 2016, the following periodic filings were signed, and certified pursuant to SOX, by Defendants Pera and Spragg: the Company's August 21, 2015 Form 10-K, announcing the Company's results for the quarter and fiscal year ended June 30, 2015 (the "2015 10-K"); the Company's November 5, 2015 Form 10-Q announcing the Company's results for the quarterly period ended September 30, 2015 (the "November 5, 2015 10-Q"); and the Company's February 4, 2016 Form 10-Q announcing the Company's results for the quarter ended December 31, 2015 (the "February 4, 2016 10-Q"). From May 5, 2016 through February 8, 2018, the following periodic filings were signed, and certified pursuant to SOX, by Defendants Pera an Radigan: the Company's May 5, 2016 Form 10-Q announcing the Company's results for the quarter ended March 31, 2016 (the "May 5, 2016 10-Q"); the Company's August 22, 2016 Form 10-K announcing the Company's results for the quarter

A.    **Ubiquiti Reported False Accounts Receivable**

200.   The Class Period begins on May 9, 2013 when Ubiquiti filed its May 9, 2013 10-Q.   Among other things, the Company's May 9, 2013 10-Q disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million:

### UBIQUITI NETWORKS, INC.
#### Condensed Consolidated Balance Sheets
#### (In thousands, except share data)
#### (Unaudited)

|  | March 31, 2013 | June 30, 2012 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $       181,689 | $       122,060 |
| Accounts receivable, net of allowance for doubtful accounts of $2,700 and $1,266, respectively | 38,417 | 75,644 |
| Inventories | 19,381 | 7,734 |
| Current deferred tax asset | 882 | 882 |
| Prepaid expenses and other current assets | 3,269 | 1,577 |
| Total current assets | 243,638 | 207,897 |
| Property and equipment, net | 6,178 | 4,471 |
| Long-term deferred tax asset | 232 | 232 |
| Other long–term assets | 1,775 | 1,136 |
| Total assets | $       251,823 | $       213,736 |

201.   The Company's May 9, 2013 Form 10-Q also alluded to customers with receivables representing over 10 percent of its total outstanding receivables. In particular, Ubiquiti reported that a company it called "Customer D" accounted for 12 percent of its reported

---

and fiscal year ended June 30, 2016 (the "2016 10-K"); the Company's November 7, 2016 Form 10-Q announcing the Company's results for the quarter ended September 30, 2016 (the "November 7, 2016 10-Q"); the Company's February 9, 2017 Form 10-Q announcing the Company's results for the quarter ended December 31, 2016 (the "February 9, 2017 10-Q"); the Company's May 4, 2017 Form 10-Q announcing the Company's results for the quarter ended March 31, 2017 (the "May 4, 2017 10-Q"); the Company's August 25, 2017 Form 10-K announcing the Company's results for the quarter and fiscal year ended June 30, 2017 (the "2017 10-K"); the Company's November 9, 2017 Form 10-Q announcing the Company's results for the quarter ended September 30, 2017 (the November 9, 2017 10-Q"); and the Company's February 8, 2018 Form 10-Q announcing the Company's results for the quarter ended December 31, 2017 (the "February 8, 2018 10-Q").  When these periodic SEC filings are referenced throughout this Section V, they refer to the filings that were signed, and certified pursuant to SOX, by the individuals described in this footnote.

55

$75.6 million in receivables as of June 30, 2012, meaning that Customer D's share of the receivable was $9.072 million.

| | Percentage of Revenues | | | | Percentage of Accounts Receivable | |
| | Three Months Ended March 31, | | Nine Months Ended March 31, | | March 31, | June 30, |
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
|---|---|---|---|---|---|---|
| Customer A | 15% | 20% | 13% | 19% | 13% | 19% |
| Customer B | * | 10% | * | * | 10% | * |
| Customer C | * | * | * | 10% | 13% | 11% |
| Customer D | * | * | * | * | * | 12% |

*denotes less than 10%*

202.   On May 9, 2013, Ubiquiti also held an earnings call to discuss its Q3 2013 results. Defendant Foster highlighted the record low days sales outstanding in accounts receivable ("DSO") of 42 days, which he stated "is really [a] proxy for the health of our distribution channel."   He also attributed the "vast improvement" in accounts receivable to "account receivables controls" implemented during the quarter.

203.   During the Company's August 8, 2013 Earnings Call reporting on Q4 2013 financial results, Defendant Pera responded to a question regarding what brought about the marked financial success in the quarter and positive guidance by stating that the Company has "addressed [its] deficiencies" including that the "management team [was] revamped," there was "new discipline in operations," and "***finally [there was] discipline in how [the Company] treat[ed] accounts receivables.***"   He further stated that everything else, including the brand and customers stayed the same, but the Company "just cleaned up and plugged the holes." (Emphasis added).

204.   On September 13, 2013, Ubiquiti filed its 2013 10-K (as defined in footnote 18, *supra*).   It once again disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million:

## UBIQUITI NETWORKS, INC.
### Consolidated Balance Sheets
### (In thousands, except share data)

| | June 30, | |
| --- | --- | --- |
| | **2013** | **2012** |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 227,826 | $ 122,060 |
| Accounts receivable, net of allowance for doubtful accounts of $2,200 and $1,266, respectively | 35,884 | 75,644 |
| Inventories | 15,880 | 7,734 |
| Current deferred tax asset | 733 | 882 |
| Prepaid expenses and other current assets | 3,151 | 1,577 |
| Total current assets | 283,474 | 207,897 |
| Property and equipment, net | 5,976 | 4,471 |
| Long-term deferred tax asset | 4 | 232 |
| Other long–term assets | 2,886 | 1,136 |
| Total assets | $ 292,340 | $ 213,736 |

205.    The 2013 10-K once again identified customers with account balances greater than 10 percent of total accounts receivable. But, in a change from the May 9, 2013 Form 10-Q, it identified such customers by name.  Accordingly, the customer with 12 percent of the accounts receivables as of June 30, 2012 – previously referred to as "Customer D" – was actually called Discomp.

206.    The $9.072 million receivable that Ubiquiti attributed to Discomp, and therefore Ubiquiti's entire accounts receivable disclosure, referenced in ¶¶ 200-05, were materially false and/or misleading for the reasons set forth in ¶ 199(i) and (vii)-(viii)  above.

207.    Ubiquiti also reported accounts receivables for Discomp or "Customer D" by making substantially similar misstatements as those referenced in ¶¶ 200-05 in the following SEC filings (as defined in footnote 18, *supra*): the November 8, 2013 10-Q; the May 9, 2014 10-Q; the November 6, 2014 10-Q; the February 4, 2016 10-Q; the May 5, 2016 10-Q; the 2016 10-K; the February 9, 2017 10-Q; and the May 4, 2017 10-Q.

57

208.   Moreover, Ubiquiti's falsely reporting its accounts receivable was not isolated to Discomp.

209.   The 2015 10-K (as defined in footnote 18, *supra*) reported, among other things, a total of $66.1 million in receivable as of that day:

### UBIQUITI NETWORKS, INC.
#### Consolidated Balance Sheets
#### (In thousands, except share data)

| | | June 30, | | |
|---|---|---|---|---|
| | | 2015 | | 2014 |
| **Assets** | | | | |
| Current assets: | | | | |
|     Cash and cash equivalents | $ | 446,401 | $ | 347,097 |
|     Accounts receivable, net of allowance for doubtful accounts of $1,071 and $1,395, respectively | | 66,104 | | 54,871 |
|     Inventories | | 37,031 | | 46,349 |
|     Current deferred tax assets | | 1,535 | | 884 |
|     Prepaid income taxes | | 2,566 | | 3,256 |
|     Prepaid expenses and other current assets | | 27,709 | | 13,267 |
|         Total current assets | | 581,346 | | 465,724 |
| Property and equipment, net | | 15,602 | | 7,260 |
| Long-term deferred tax assets | | 1,515 | | 1,255 |
| Other long–term assets | | 2,109 | | 1,912 |
| Total assets | $ | 600,572 | $ | 476,151 |

210.   Ubiquiti once again disclosed customers with receivables greater than 10 percent of the total. In the chart below, it disclosed that a customer called P.W. Batna Magdalena Mucha ("Batna") accounted for 12 percent of the receivables as of that date – meaning that Batna's share was $7.93 million:

| | Percentage of Revenues | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|
| | Years Ended June 30, | | | June 30, | |
| | 2015 | 2014 | 2013 | 2015 | 2014 |
| Flytec Computers, Inc. | * | 13% | 13% | * | 13% |
| Streakwave Wireless, Inc. | * | * | * | 13% | 12% |
| P.W. Batna Magdalena Mucha | * | * | * | 12% | 12% |

*denotes less than 10%*

211.   In addition, the February 4, 2016 10-Q (as defined in footnote 18, *supra*) disclosed, among other things, that the Company had accounts receivable of $64.6 million as of December 31, 2015 and it reiterated the $66.1 million receivable figure as of June 30, 2015 in a separate column:

## UBIQUITI NETWORKS, INC.
### Condensed Consolidated Balance Sheets
### (In thousands, except share data)
### (Unaudited)

| | December 31, 2015 | June 30, 2015 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $  496,672 | $  446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | 64,568 | 66,104 |
| Inventories | 33,105 | 37,031 |
| Vendor deposits | 15,620 | 19,998 |
| Current deferred tax asset | 1,535 | 1,535 |
| Prepaid income taxes | — | 2,566 |
| Prepaid expenses and other current assets | 8,440 | 7,711 |
| Total current assets | 619,940 | 581,346 |
| Property and equipment, net | 13,359 | 15,602 |
| Long-term deferred tax asset | 1,538 | 1,515 |
| Other long-term assets | 1,918 | 2,109 |
| Total assets | $  636,755 | $  600,572 |

212.   In the Company's February 4, 2016 10-Q, Ubiquiti stopped reporting the names of customers with receivables greater than 10 percent of the total receivable. Instead, Ubiquiti employed pseudonyms. Specifically, Ubiquiti identified "Customer C" as accounting for 12 percent of the June 30, 2015 account receivable, or $7.9 million, and 14 percent of the December

31, 2015 receivable.  Because Batna represented 12% of accounts receivable as of June 30, 2015, it follows that Batna is "Customer C."

213.   Ubiquiti further reported in its February 4, 2016 Form 10-Q that its total accounts receivable as of December 31, 2015 were $64.6 million:

### UBIQUITI NETWORKS, INC.
#### Condensed Consolidated Balance Sheets
#### (In thousands, except share data)
#### (Unaudited)

|  | December 31, 2015 | June 30, 2015 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 496,672 | $ 446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | 64,568 | 66,104 |
| Inventories | 33,105 | 37,031 |
| Vendor deposits | 15,620 | 19,998 |
| Current deferred tax asset | 1,535 | 1,535 |
| Prepaid income taxes | — | 2,566 |
| Prepaid expenses and other current assets | 8,440 | 7,711 |
| Total current assets | 619,940 | 581,346 |
| Property and equipment, net | 13,359 | 15,602 |
| Long-term deferred tax asset | 1,538 | 1,515 |
| Other long-term assets | 1,918 | 2,109 |
| Total assets | $ 636,755 | $ 600,572 |

214.   The 14 percent of the $64.6 million receivable owed from Batna was accordingly $9.04 million.  This amount, and therefore Ubiquiti's entire accounts receivable disclosure, referenced in ¶¶ 209-13, were materially false and/or misleading for the reasons set forth in ¶ 199(i) and (vii)-(viii) above.

215.   Ubiquiti also reported accounts receivables for Batna or "Customer C" making substantially similar misstatements as those referenced in ¶¶ 209-13 in the following SEC filings (as defined in footnote 18, *supra*): the May 9, 2013 10-Q; the November 8, 2013 10-Q; the

February 7, 2014 10-Q; the May 9, 2014 10-Q; the November 6, 2014 10-Q; the February 5, 2015 10-Q; the November 5, 2015 10-Q; the May 5, 2016 10-Q; the 2016 10-K; the November 7, 2016 10-Q; the February 9, 2017 10-Q; and the May 4, 2017 10-Q; the 2017 10-K; the November 9, 2017 10-Q; and the February 8, 2018 10-Q.

**B.**     **Ubiquiti's Statements Regarding Internal Controls Were False and Misleading**

216.   The Company's 2013 10-K contained SOX certifications signed by Defendants Pera and Foster, who certified that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Ubiquiti Networks, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

217.   In addition, the following Ubiquiti SEC filings contained SOX certifications signed by Pera and Foster that are substantially similar to the certifications described in the prior paragraph: the May 9, 2013 10-Q; the November 8, 2013 10-Q; the February 7, 2014 10-Q; the May 9, 2014 10-Q;  the 2014 10-K; the November 6, 2014 10-Q; the February 5, 2015 10-Q; and the May 7, 2015 10-Q (all as defined in footnote 18, *supra*).

218.   The statements referenced in ¶¶ 216-17 above were materially false and/or misleading for the reasons set forth in ¶ 199(ii) and (vii)-(viii) above, particularly because Ubiquiti failed to disclose that it completely lacked a system of internal controls.

219.   On August 6, 2015, Ubiquiti filed a Form 8-K with the SEC, signed by Defendant Pera, reporting that the Company learned in June 2015 that it was a victim of criminal fraud that

involved employee impersonation and fraudulent requests targeting the finance department which resulted in transfers of funds aggregating $46.7 million to the fraudsters.

220.   Ubiquiti later disclosed further details about the business e-mail fraud on the Company in its 2015 Form 10-K (as defined in footnote 18, *supra*), including certain remediation efforts that the Company was taking.

221.   The 2015 Form 10-K contained SOX certifications signed by Defendants Pera and Spragg that were substantially similar to those described in ¶ 216.

222.   Ubiquiti disclosed in the 2015 10-K:

*As of June 30, 2015, management determined that the Company did not maintain an effective control environment, attributable to a lack of sufficient, competent personnel necessary for effective financial reporting.*

\*          \*          \*

*However, management has determined that the foregoing material weaknesses did not result in a material misstatement in the consolidated financial statements as of June 30, 2015.*

223.   The Company reiterated the statements described in the prior paragraph and described the Company's remediation efforts in the following subsequent SEC filings, all of which contained SOX certifications substantially similar to those described in ¶ 216, except that they were signed by the parties noted in footnote 18, *supra*: the November 5, 2015 Form 10-Q; the February 4, 2016 Form 10-Q; the May 5, 2016 Form 10-Q; the 2016 10-K; the November 7, 2016 Form 10-Q; the February 9, 2017 Form 10-Q; and the May 4, 2017 Form 10-Q.

224.   In addition, on the Company's August 6, 2015 earnings conference call in connection with its announcement of its results for the fourth quarter and full year of the Company's fiscal 2015, Defendant Pera described the  $46.7 million fraud as "an isolated incident that basically a couple individuals within the accounting group displayed incredibly poor judgment and incompetence."

225.   On December 8, 2016, Ubiquiti filed a Form 8-K with the SEC, signed by Defendant Pera, stating that on December 5, 2016, the Company dismissed PwC as its independent registered public accounting firm.  Ubiquiti reiterated the disclosures it made in its 2015 10-K regarding its failure to maintain effective internal controls, but gave no reason for PwC's dismissal other than to state:

> During the fiscal years ended June 30, 2015 and 2016, and the subsequent interim period through December 5, 2016, the Company has not had any disagreements with PwC on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to PwC's satisfaction, would have caused PwC to make reference thereto in their reports on the Company's financial statements for such years.

226.   The statements referenced in ¶¶ 219-25 were false and/or misleading for the reasons set forth in ¶ 199(ii) and (vii)-(viii) above, particularly because Defendants had no basis to state that "management has determined that the foregoing material weaknesses did not result in a material misstatement in the consolidated financial statements" or that the e-mail fraud was an "isolated incident," and because Defendants failed to disclose the reason why the Company fired PwC as its independent auditor and failed to disclose the full extent of the Company's remediation efforts.

227.   Beginning with its 2017 10-K (as defined in footnote 18, *supra*), Defendants described the Company's internal control failures as having been fully remediated.  They reported that the Company's material weaknesses in internal controls over financial reporting were in the past, stating in relevant part: "During the period covered by this Annual Report on Form 10-K, we completed the remediation efforts of the material weaknesses . . . and conclude that our previously reported material weaknesses in our internal controls over financial reporting have been successfully remediated as of June 30, 2017."

228.  In addition, in the 2017 10-K, Defendants continued to state that "management has determined that the foregoing material weaknesses did not result in a material misstatement in the consolidated financial statements."

229.  Ubiquiti also made these statements about its completion of remediation efforts for its material weaknesses in internal controls over financial reporting, and management's determination concerning resulting material misstatements, substantially similar to those in ¶¶ 227-28 in the November 9, 2017 Form 10-Q and the February 8, 2018 Form 10-Q (as defined in footnote 18, *supra*).

230.  The Company's 2017 10-K, November 9, 2017 Form 10-Q, and February 8, 2018 Form 10-Q contained SOX certifications substantially similar to those described in ¶ 216, except that they were signed by Defendants Pera and Radigan.

231.  The statements referenced in ¶¶ 227-30 were false and/or misleading for the reasons set forth in ¶ 199(ii) and (vii)-(viii) above, particularly because Defendants had no basis to state that "management has determined that the foregoing material weaknesses did not result in a material misstatement in the consolidated financial statements" and Defendants failed to disclose the full extent of the Company's remediation efforts.  In addition, portraying the Company's internal control failures as being in the past and fully remediated was misleading because Defendants failed to disclose the fact that those issues were already the subject of, or were highly likely to lead to, regulatory oversight, such as the SEC's investigation into those problems.

## C.   Ubiquiti's False and Misleading Statements Concerning Its "Disruptive Business Model"

232.  Ubiquiti attributes its financial performance to what it calls its "unusual" and "disruptive business model."

65

233.   For example, in the Company's May 9, 2013 Form 10-Q (as defined in footnote 18, *supra*), Defendants described the Company's "disruptive business model" as follows:

> Ubiquiti Networks is a product driven technology company that designs end-to-end networking solutions for service providers and enterprises. Our technology platforms focus on delivering highly-advanced and efficiently deployable solutions that appeal to a global customer base in underserved and underpenetrated markets. Our differentiated business model, focused around the Ubiquiti Community, has enabled us to break down traditional barriers, such as high product and network deployment costs, and offer solutions with disruptive price-performance characteristics. This disruptive business model, combined with our innovative proprietary technologies, has resulted in an attractive alternative to traditional relationship based, high-cost providers, allowing us to advance the market adoption of platforms for ubiquitous connectivity.

234.   Similarly, in Ubiquiti's 2013 10-K (as defined in footnote 18, *supra*), Defendants stated that "[o]ur products and solutions enable both service providers and enterprises to deploy the infrastructure for high performance, scalable and reliable wireless networks cost effectively." Ubiquiti further states that one of the "key benefits" of its model is its "*Price disruptive offering. Our products and solutions have been designed to enable service providers and enterprises to deliver high performance to their users at highly disruptive price points.*"

235.   Defendants reiterated statements substantially similar to those referenced in ¶¶ 232-34 in the following SEC filings (as defined in footnote 18, *supra*): the November 8, 2013 10-Q; the February 7, 2014 10-Q; the May 9, 2014 10-Q; the 2014 10-K; November 6, 2014 10-Q; the February 5, 2015 10-Q; the May 7, 2015 10-Q; the 2015 10-K; the November 5, 2015 10-Q; the February 4, 2016 10-Q; the May 5, 2016 10-Q; the 2016 10-K; the November 7, 2016 10-Q; the February 9, 2017 10-Q; the May 4, 2017 10-Q; the 2017 10-K; the November 9, 2017 10-Q; and the February 8, 2018 10-Q.

236.   On February 21, 2017, Ubiquiti filed with the SEC an investor presentation that was attached as an exhibit to a Form 8-K filed that day and signed by Defendant Pera.  This presentation stated that the Company's "Successful, Disruptive Business Model," which includes

66

"Global Markets Targeted – Underserved & Underpenetrated" and "Disruptive Pricing – Up to 80% lower cost than competitors," results in "An Unusual Combination – Disruptive Model + Highly Profitable."

237.  Ubiquiti reiterated statements substantially similar to those in the prior paragraph in each of its updated investor presentations including: an August 10, 2017 investor presentation filed as an exhibit to a Form 8-K filed with the SEC that day and signed by Defendant Pera; and its November 9, 2017 investor presentation filed as an exhibit to a Form 8-K filed with the SEC that day and signed by Defendant Pera.

238.  In addition, Pera stated on an August 3, 2017 conference call in connection with the Company's earnings release for its fiscal 2017, "I believe up to this point in time Ubiquiti as a company has been misunderstood by a lot of people. I feel we have a group of core competencies that gives us the great competitive advantage in the market." By that point in time, however, Ubiquity had already been espousing the benefits of its "unusual" and "disruptive business model" for many years, such as in the statements described above.

239.  The statements referenced in ¶¶ 232-38 above were materially false and/or misleading for the reasons set forth in ¶ 199(iii) and (vii)-(viii) above.

**D.**     **Ubiquiti Inflated the Ubiquiti Community's Metrics and Level of Engagement**

240.  In its May 9, 2013 10-Q (as defined in footnote 18, *supra*), Ubiquiti stated that a "core" and "critical" element of its business strategy is its "disruptive business model" which is driven by a "***large, growing and highly engaged community,***" referred to as the Ubiquiti Community.  The Company also stated that there is "***active engagement***" between the Ubiquiti Community and the research and development personnel, which is a driving force in the "rapid introduction and adoption of optimally designed products."  And the Company went even further, describing the Ubiquiti Community as providing "viral marketing" which "drive[s]

market awareness and demand for [its] products and solutions" and "enables [the Company] to reach underserved and underpenetrated markets far more efficiently and cost effectively than is possible through traditional sales models." (Emphasis added).

241. Ubiquiti reiterated substantially similar statements to those referenced in the prior paragraph, in the following SEC filings (as defined in footnote 18, *supra*): the 2013 10-K; the November 8, 2013 10-Q; the February 7, 2014 10-Q; the May 9, 2014 10-Q; the 2014 10-K; the November 6, 2014 10-Q; and the February 5, 2015 10-Q; the May 7, 2015 10-Q; the 2015 10-K; the November 5, 2015 10-Q; the February 4, 2016 10-Q; the May 5, 2016 10-Q; the 2016 10-K; the November 7, 2016 10-Q; the February 9, 2017 10-Q; the May 4, 2017 10-Q, and the 2017 10-K.

242. Additionally, on November 6, 2014, Ubiquiti held an earnings call to discuss its Q1 2014 results. In response to an analyst's question about the quarter's decreased revenues and when the growth trajectory would be expected to trend back upwards, Defendant Pera focused on the Company's overall long term growth and emphasized the continuous fast growth and engagement of the Ubiquiti Community as the Company's key indicator of growth going forward, stating in relevant part: "If you look at things like our forum and the level of engagement and traffic and the new customers and evangelism, it's growing very fast. I think the total time spent and activity on our community is doubled year-over-year. So the trends I look at to evaluate the business are all positive."

243. In addition, on February 21, 2017, Ubiquiti filed with the SEC an investor presentation that was as an exhibit to a Form 8-K signed by Defendant Pera. This February 21, 2017 investor presentation described the Ubiquiti Community as a "Core Competitive Advantage" and as central to the Company's "Disruptive Business Model." The investor

presentation also stated that the "advantages" of the Ubiquiti Community included "[h]ighly engaged and loyal evangelists," a driver of market awareness that "avoids traditional sales force," real time R&D feedback that leads to "faster, lower cost product development," and that the Ubiquity Community is "[s]calable and self-sustaining." The investor presentation also listed the Company's ability to "[c]ontinue to grow [its] powerful user community" as a key to its future success.

244.   Moreover, beginning in February 2017, Ubiquiti not only stated the core role that the Ubiquiti Community played in its "disruptive business model," but it also stated specific quantitative metrics about the Ubiquiti Community.

245.   On February 9, 2017, Ubiquiti filed a press release as an exhibit to a Form 8-K that was signed by Defendant Pera, announcing its second quarter 2017 financial results. In the press release, Ubiquiti stated that "[o]ur growth is supported by the Ubiquiti Community, a global, grass-roots community of *4 million* entrepreneurial operators and systems integrators who engage in thousands of on-line forums at http://www.ubnt.com." (Emphasis added).

246.   Ubiquiti reiterated the statement referenced in the prior paragraph in subsequent SEC filings, including the Company's May 4, 2017 press release filed as an exhibit to a Form 8-K filed that day, signed by Defendant Pera, announcing the Company's third quarter 2017 financial results; and in an August 3, 2017 press release filed as an exhibit to a Form 8-K filed that day, signed by Defendant Pera, announcing the Company's fourth quarter 2017 financial results.

247.   Similarly, the February 21, 2017, investor presentation described above summarized the role of the Ubiquiti Community in Ubiquiti's business model with the following statements: Ubiquiti had a "Successful, Disruptive Business Model" (slide 4) and was "a high

performance company" (slide 5) with "The Ubiquiti Community" as the centerpiece of the model (slide 15); in 2016, ***there were 4 million registered users,*** 11 million active user sessions, and 173,000 new members registered (slide 16); the Ubiquiti Community was made up of "[h]ighly engaged and loyal evangelists" which had the advantage of "[d]riv[ing] market awareness [and] avoid[ing] traditional sales force" and was "[s]calable and self-sustaining" (slide 17); "[d]istributors, resellers and connection with Ubiquiti Community drives sales" also "[a]voids [c]ost of a [s]ales [f]orce" (slide 21).  (Emphasis added).

248.   Ubiquiti made statements substantially similar to the ones referenced in ¶¶ 243 and 247, in an updated investor presentation on August 10, 2017, filed as an exhibit to a Form 8-K filed that day, that was signed by Defendant Pera.

249.   In addition, in the 2017 10-K (as defined in footnote 18, *supra*), Ubiquiti *increased* the size of the Ubiquiti Community, stating that "[o]ur growth is supported by the Ubiquiti Community, a global, grass-roots community of ***over 4 million*** entrepreneurial operators and systems integrators who engage in thousands of on-line forums at http://www.ubnt.com." (Emphasis added).

250.   Then, even after the Citron Report was published, and after the Company disclosed in a November 9, 2017 Form 8-K filed with the SEC and signed by Defendant Pera that the Ubiquiti Community included only about 609,000 registered users, Ubiquiti issued another updated investor presentation on November 9, 2017, filed as an exhibit to a Form 8-K filed that day, signed by Defendant Pera, repeating statements regarding the Ubiquiti Community that—other than the now-debunked Community metrics—were substantially similar to the ones referenced in ¶¶ 243, 247-48 (from the Company's February and August 2017 investor presentations).  In particular, the November 9, 2017 investor presentation continued to tout the

importance of the Ubiquiti Community as central to the Company's "Disruptive Business Model" and a "Core Competitive Advantage;" summarized Ubiquiti's "disruptive" business model with "The Ubiquiti Community" at the centerpiece, stating the Ubiquiti Community was made up of "[h]ighly engaged and loyal evangelists" which had the advantage of "[d]riv[ing] market awareness [and] avoid[ing] traditional sales force" and was "[s]calable and self-sustaining"; and stated that "connection with Ubiquiti Community drives sales" and "[a]voids [c]ost of a [s]ales [f]orce".

251. In an investor call that day (November 9, 2017), when an analyst asked about the vast reduction in the reported size of the Ubiquiti Community, Pera responded that it "sounds like your shorts are getting nervous." In an attempt to minimize the significance of the Company's prior misstatements about the "critical" nature of the Ubiquiti Community, Pera stated, "I don't think that number is really that critical of an observation. Our IR people mixed up user sessions and total users. But regardless, our user community is more engaged than ever. . . . It's a huge improvement in my opinion in the quality of the community engagement."

252. Defendants also continued to tout the Ubiquiti Community in other ways following the Citron Report. The Company's November 9, 2017 10-Q and its February 8, 2018 Form 10-Q (as defined in footnote 18, *supra*) continued to tout the Ubiquiti Community with similar statements as those described above, including, for example: that a "core" element of its business strategy is its differentiated business model, which is driven by a "large, growing and highly engaged community," referred to as the Ubiquiti Community; that the Ubiquiti Community is an "important element of our business strategy as it enables us to drive: Rapid customer and community driven product development [which includes] 'active engagement' between the Ubiquiti Community and our development engineers… Scalable sales and

marketing model [which includes] viral marketing [that] enables us to reach underserved and underpenetrated markets far more efficiently and cost effectively than is possible through a traditional direct sales force model [and s]elf-sustaining product support."

253.   The statements referenced in ¶¶ 240-52 were false and/or misleading for the reasons set forth in ¶ 199(iii)-(iv) and (vii)-(viii) above.   In these statements that Defendants made until November 9, 2017, Defendants repeatedly overstated the number of members and misstated the level of engagement of the Ubiquiti Community and the Community's role in the Company's supposedly "disruptive business model."   In these statements that Defendants made since November 9, 2017, Defendants overstated or failed to disclose the number of Ubiquiti Community members that were created by real people (rather than through artificial means such as bots) and continued to misstate the level of engagement of the Ubiquiti Community and the Community's role in the Company's supposedly "disruptive business model."

**E.**   **Ubiquiti Had No Basis for its Forecasted Financial Performance Following the Citron Report**

254.   On the September 26, 2017 Investor Day call, Pera discussed, among other things, Ubiquiti's August 2017 launch of the Company's new FrontRow camera, the strength of the Company's inventory position, the profitability of the Company's product lines, and the visibility that Ubiquiti's inventory gave Defendants into the Company's sales and financial results.   He stated, "So I think one of the reasons we're executing much better is because we erred on this side of caution with inventory. And we have a sizable Utah warehouse. . . . I know a big knock on us is visibility. And I believe our business is very stable, very visible. We're not making video games and movies where we live hit by hit like consumer electronic companies. We have lifetime customers. . . . I'm not worried about the inventory. The levels might be high, but you're dealing with long lifecycle products."

255.   On November 9, 2017, Ubiquiti issued a press release filed with the SEC on Form 8-K announcing its "Record Revenue" for the first fiscal quarter of 2018 ended September 30, 2017.   Emphasizing its "record" results and touting its launch in mid-August of FrontRow camera featuring new technology, the press release provided the following "Business Outlook" for Ubiquiti's second quarter of fiscal 2018 (ending December 31, 2017):

- Revenues of between $240 million and $250 million;

- GAAP diluted EPS of $0.85-$0.92;

- Gross margins are expected to remain consistent on a sequential basis; and

- An effective tax rate of 13.5%."

256.   At that point, as of November 9, 2017, the FrontRow camera had already been on the market for nearly three months and Ubiquiti was already well over a month into its second quarter of fiscal 2018.

257.   Also, in its November 9, 2017 10-Q (as defined in footnote 18, *supra*), Ubiquiti repeated the statements and financial forecast contained in its press release from that day.

258.   The statements referenced in ¶¶ 254-57 were false and/or misleading for the reasons set forth in ¶ 199(v) and (vii)-(viii) above.

## F.   Ubiquiti Failed to Disclose the High Likelihood—or Existence of—the SEC's Investigation

259.   Since the beginning of the Class Period, Ubiquiti has disclosed several regulatory and legal matters, including the OEE and OFAC matters related to products sold into Iran by the Company's distributors (discussed above); two securities class actions filed against Ubiquiti in the Northern District of California beginning on September 7, 2012; a class action lawsuit filed in the Northern District of California on February 3, 2017 against Ubiquiti alleging violations of

the Digital Millennium Copyright Act; and a lawsuit filed against Ubiquiti on April 19, 2017, in the Central District of California, alleging patent infringement.

260.   Ubiquiti made these disclosures of regulatory and legal matters as applicable in each of its periodic SEC filings during the Class Period, as defined in footnote 18, *supra*, including: the May 9, 2013 10-Q; the 2013 10-K; the November 8, 2013 10-Q; the February 7, 2014 10-Q; the May 9, 2014 10-Q; the 2014 10-K; the November 6, 2014 10-Q; the February 5, 2015 10-Q; the May 7, 2015 10-Q; the 2015 10-K; the November 5, 2015 10-Q; the February 4, 2016 10-Q; the May 5, 2016 10-Q; the 2016 10-K; the November 7, 2016 10-Q; the February 9, 2017 10-Q; the May 4, 2017 10-Q; the 2017 10-K; the November 9, 2017 10-Q; and the February 8, 2018 10-Q.

261.   On September 18, 2017, the day the Citron Report was published, CNBC host Scott Wapner responded to a tweet by Pera by asking "4. One analyst I spoke to said you 'push the envelope' on parts of the business.  How do you respond to that?; 5. Have you heard from the SEC?"  Pera posted several tweets that day in response to the Citron Report, but he did not respond to this tweet by Wapner.

262.   Defendants also described the OFAC  and OEE compliance matters as having been "resolved," with the Company having "taken significant steps towards ensuring our compliance with export control regulations and embargoes."  Ubiquiti made these statements in each of its periodic SEC filings during the Class Period from the August 22, 2014 10-K through the February 8, 2018 10-Q (as defined in footnote 18, *supra*).  But Defendants failed to disclose in these filings that Ubiquiti's practices related to these topics continued to subject the Company to the high likelihood that it would be—or already was—subject to regulatory oversight, such as the SEC's investigation.

263.   In addition, the statements referenced in ¶¶ 259-62 were false and misleading for the reasons set forth in ¶ 199(viii) above.

**G.**   **False and Misleading Statements Concerning Related-Party Transactions**

264.   Each of Ubiquiti's periodic SEC filings during the Class Period starting with the February 7, 2014 10-Q (as defined in footnote 18, *supra*), other than the Company's 2014 10-K, contained a section entitled "Related Party Transactions and Certain Other Transactions."  The only topic that any of these disclosures discussed was the Company's  Aircraft Lease Agreement concerning its lease of an aircraft from a company owned by Defendant Pera.

265.   In addition, each of Ubiquiti's annual Forms 10-K filed during the Class period (as defined in footnote 18, *supra*) contained a section entitled "Certain Relationships and Related Transactions, and Director Independence."  These disclosures stated that "[t]he information required by this Item 13 is incorporated by reference to our Proxy Statement for the" Annual Meeting of Stockholders for the respective year at issue "under the headings 'Certain Relationships and Related Party Transactions' and 'Corporate Governance—Committees of the Board of Directors.'"

266.   Each of the Company's Schedule 14A Proxy Statements filed during the Class Period, in turn, contained a section entitled "Certain Relationships and Related Party Transactions."  These included the Company's Schedule 14A filings that it made on October 28, 2013, signed by Defendant Foster, for the 2013 Annual Meeting of Stockholders; on October 28, 2014, signed by Defendant Foster, for the 2014 Annual Meeting of Stockholders; on October 27, 2015, signed by Defendant Pera, for the 2015 Annual Meeting of Stockholders; on October 27, 2016, signed by Defendant Pera, for the 2016 Annual Meeting of Stockholders; and on October 27, 2017, signed by Defendant Foster, for the 2017 Annual Meeting of Stockholders.

267. The "Certain Relationships and Related Party Transactions" section of the Company's 2013 Proxy Statement stated that "[w]e did not have any transactions since the beginning of fiscal 2013 to which we were a party in which the amount involved exceeded or exceeds $120,000 and in which any of our directors, executive officers, holders of more than 5% of any class of our voting securities or any member of the immediate family of any of the foregoing persons, had or will have a direct or indirect material interest, other than compensation arrangements with directors and executive officers."

268. The "Certain Relationships and Related Party Transactions" of the Company's Proxy Statements from 2014 through 2017 described the Company's Aircraft Lease Agreement and then made substantially the same disclosure concerning the lack of related party transactions described in the prior paragraph, "[o]ther than the Aircraft Lease Agreement discussed above."

269. The statements referenced in ¶¶ 264-68 were false and misleading for the reasons set forth in ¶ 199(vi)-(viii) above.

**H.    False and Misleading Statements Continue After the Citron Report**

270. Ubiquiti responded to the Citron Report by employing a multipronged approach of 1 - flatly denying the points raised by the Report and 2 - announcing positive news to distract the market's attention from and undermine Citron's accusations concerning the Company's business model.

271. As part of this approach, the Company continued in Ubiquiti's regular financial disclosures to make the misstatements described above concerning its financial metrics, internal controls, business model, the Ubiquiti Community, legal proceedings, and related-party transactions, including in its November 9, 2017 10-Q and February 8, 2018 10-Q (as defined in footnote 18, *supra*) and related press releases and earnings conference calls, as well as in its

November 9, 2017 revised investor presentation.  These false and misleading statements have already been described in Sections V.A through G above.

272.   In addition, Ubiquiti and Defendant Pera went to great lengths to specifically deny the Citron Report's allegations.

273.   On September 18, 2017, the same day the Citron Report was released, Pera responded to the Citron Report via several messages from his Twitter account, @RobertPera.  He responded to a tweet from Citron's account announcing the report by stating, "I just put my head down and let the products and numbers speak for themselves.  My apologies to those affected by these clowns."[19]

274.   On the same day, Pera also tweeted, "I am consumed with product development and don't have time to entertain accusations of stock manipulators.  But, will take questions here."   In response to CNBC host Scott Wapner's questions concerning whether Ubiquiti's "numbers 'are a farce,'" why there are only four people on the Company's Board, and why the company does not have a CFO, Pera responded, "1. Ask KPMG (our auditors).  Also, we have bought back $100mm's in stock…where did that cash come from?  Not the tooth fairy."[20]

275.   In the same chain of Pera's tweets, in response to a question from a user about whether Ubiquiti has a universal vetting process for distributors (i.e., do the same standards apply regardless of country), and who in the Company's lean corporate structure is the main interface with distributors, Pera replied, "we have a strong channel management team on the ground in different regions of world."

---

[19] *Available at* https://twitter.com/RobertPera/status/909784361402343425 (*last accessed* Dec. 21, 2018).

[20] *Available at* https://twitter.com/RobertPera/status/909846375470387202 (*last accessed* Dec. 21, 2018).

276.    Wapner posted again in response to Pera's original tweet, asking "4. One analyst I spoke to said you 'push the envelope' on parts of the business.  How do you respond to that?; 5. Have you heard from the SEC?"  Pera again did not respond to Wapner this time.

277.    In addition, Ubiquiti used its September 26, 2017 Investor Day conference call to dismiss the Citron Report's accusations.  This was the first time that the Company held such a conference, which it did to try to rebut and distract attention from the allegations made in the Citron Report.

278.    At this September 26, 2017 conference, Pera forcefully denied the claims in the Citron Report when asked specifically about them, as follows:

> [Participant:] [W]ould you like to address the recent short report in as generally or specifically as you like . . . ?

> [Pera:] Well, first, it's kind of hard to tell someone the sky is really blue, you know. I could – what am I going to do? Tell them to look up the sky is blue and then people are shouting, no, the sky is red. How do you argue with that? . . . [I]f we can buy stock at fractions of a dollar, we feel it's undervalued, then we buy it back, because it will only help our end goal of increasing long-term EPS, so you can retire more shares or EPS, the long-term is going to be higher. So it's painful, but the way I look at it is long-term shareholders are getting paid off the pain.

279.    Pera also used his remarks at this conference to reassure investors of the integrity of the Company's business model, metrics and financial prospects.  In addition, he stated that Ubiquiti's business model and the Ubiquiti Community were sources of stability and strength, that all of the Company's business units and product lines were profitable, and that the Company's stock repurchases would not only improve the stock price in the short term but also increase Ubiquiti's long term earnings per share.

280.    During this September 26, 2017 conference, Pera essentially reiterated the Company's key talking points about its "unusual" and "disruptive" business model.  He stated:

> Ubiquiti is a big departure from [traditional] operating profiles . . . . [W]e have a very efficient OpEx, and we make a lot of money. And I know some people might be confused

78

about this because you look at the level of OpEx, and the level of margin combined with the cost of goods sold being relatively high, and a lot of people applying traditional thought to this model will say something's wrong, maybe this is not sustainable.

* * *

I like how we rely on customers to do our own marketing. And I believe at the end of the day, all I care about is EPS and EPS growth . . . . And when you look ***at Ubiquiti, the way we scale is we just keep adding these aggressive ships [i.e. business units/product lines], and they're all profitable***.

* * *

[T]his past week, whenever I got frustrated with people knocking down the multiple, I just stared at this and I say, hey, maybe they're working for us, maybe they're working for long-term shareholders; you can buy back stock at discount. So, I know some of you guys were probably affected and it's been a painful week, but I think what you've seen is, we've had a big return on investment or if you invested a dollar with us at our lowest point, and I don't see why that will stop. And thanks to these guys. We'll be able to increase the long-term EPS even more with the stock that we're buying back.

* * *

[Analyst:] How do you look at your user community? Do you feel like the health [is] robust? Do you feel like it's growing the way you'd like, and how has it evolved in terms of the way you engage with the community? . . .

[Pera:] What you're looking is for the quality of the activity . . . [O]ur community activity, over the past one or two years, definitely increasing, but more than the percentage increase is the – the qualitative improvement. I think our community now is far less about issues, as it was a few years ago, and more about excitement, new products, new features and much more valuable content.  (Emphasis added).

281.   On this September 26, 2017 conference call, Pera also assured investors that there was no reason to be concerned with Ubiquiti's high level of Board turnover and thin executive ranks.  For example, addressing the continued lack of a CFO, he stated, "[m]aybe I should have just called them CFO, so everybody would shut up. All right. CAO, CFO whatever you want to call it, he is in charge of the finances, he signs the books, maybe that was my mistake, maybe we should call him as CFO. How about I add a hyphen, CAO-CFO; would that resolve everything? Don't change it? All right."

282.   The statements referenced in ¶¶ 270-81 were false and misleading for the reasons set forth in ¶ 199(i)-(viii) above, particularly because they perpetuated Ubiquiti's false narrative of the Company's performance, furthered its strategy of denial and distraction in response to the Citron Report, and failed to disclose that the Company was already subject to (or highly likely to be subject to) regulatory oversight, such as the SEC's investigation of the Company's many problems described above.

## VI.   THE TRUTH BEGINS TO EMERGE

283.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

284.   Throughout the Class Period, the price of Ubiquiti securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

285.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages

286.   After the market closed on August 6, 2015, Ubiquiti filed a Form 8-K disclosing the fraud that resulted in the theft of $46.7 million from Ubiquiti.  This disclosure also stated that "the Company, its Audit Committee and advisors have concluded that the Company's internal control over financial reporting is ineffective due to one or more material weaknesses. The Company has implemented enhanced internal controls over financial reporting since June 5, 2015 and is in the process of implementing additional procedures and controls pursuant to

recommendations from the investigation." Ubiquiti also announced that Rohit Chakravarthy (who the Company said allowed the fraud to take place) would be resigning as Chief Accounting Officer and would be replaced by Mark Spragg and FTI Consulting. The Company made these disclosures at the same time that it announced its financial results for the fourth quarter and full year of fiscal 2015.

287. The following day, on August 7, 2015, Ubiquiti's stock price fell 1.28% on unusually high volume of nearly 1.5 million shares being traded, to close at a price of $31.64.

288. The price of Ubiquiti stock would have fallen even further had the news of the e-mail fraud and internal control weaknesses not been mixed with news about the Company's financial results.

289. While Ubiquiti's August 6, 2015 disclosure started to alert the market to the Company's internal control failures, it did not disclose the full story. First, Ubiquiti described the fraud as an "isolated event." Second, Ubiquiti did not disclose the full extent of its internal control failures, stating only that "the Company, its Audit Committee and advisors have concluded that the Company's internal control over financial reporting is ineffective due to one or more material weaknesses" and that the Company had already implemented enhanced internal controls over financial reporting and was continuing to implement additional controls to address the issue. But Ubiquiti gave no details about the extent of these internal control failures or what would be necessary to address them.

290. Pera similarly reassured investors on the Company's August 6, 2015 conference call by stating that "we believe we'll recover a lot more of" the amount that was lost to-date, that it "seems to be an isolated incident" involving "a couple individuals within the accounting group displayed incredibly poor judgment and incompetence," and that "[w]e're taking it really

seriously," including by Pera "insert[ing] myself into the finance team."

291.   Market analysts therefore viewed the e-mail fraud and related internal control problems as merely a risk to monitor, rather than a full-fledged compliance breakdown.   For example, Morgan Stanley explained in an August 7, 2015 note what Ubiquiti needed to do to in the following six months to "ensure appropriate corporate control procedures," noting that the Company's "infrastructure may be too lean" to "clean-up" the accounting team "with relatively few leaders able to effect change."   The disclosure of the $47 million fraud was "disappointing . . . given recent turnover in the finance staff and past corporate controls issues," including the improper sales to sanctioned parties discussed above.

292.   Similarly, Stephens Inc., in an August 7, 2015 note titled "Just When You Thought Things Couldn't Get Stranger," stated that although Ubiquiti "reported slightly better-than-expected earnings," the theft was "the latest in a series of unfortunate events." But this analyst was still unsure of whether the fraud was a result of "a lack of internal process control."

293.   Wells Fargo stated that the fraud was a "concerning development" and "brings into question what else may be discovered at the company and warrants a continued cautious approach towards the stock."

294.   SunTrust Robinson Humphrey viewed the fraud as a "one-time event [that] it highlights some of the issues that could arise from UBNT's lean operations."   SunTrust also raised its price target for Ubiquiti to from $30 to $31 because of higher earnings per share.   But the analyst noted that the e-mail fraud "highlights some of the issues that *could* arise from UBNT's lean operations."   (Emphasis added).

295.   All of these analysts determined that more information was required to have a full understanding of Ubiquiti's internal control problems.

296.   The market was therefore surprised to learn the breadth of Ubiquiti's internal control failures that Ubiquiti disclosed when it filed its 2015 10-K with less than an hour left in the trading day on August 21, 2015.   Ubiquiti disclosed in that filing the extraordinary development that PwC, its independent auditor, refused to give the Company a clean audit opinion for the year because "the Company did not maintain, in all material respects, effective internal control over financial reporting as of June 30, 2015."

297.   Ubiquiti also disclosed in its 2015 10-K the extensive nature of its material weaknesses in internal controls, including, among other things, "the lack of comprehensive and up-to-date accounting policies and procedures, skepticism on the part of key accounting personnel, internal control training, leadership and adequate communication of roles and responsibilities," as well as the other internal control failures described above.

298.   On August 24, 3015, the following trading day, Ubiquiti's stock price fell 4.38%, to close at a price of $32.28, on higher-than-average trading volume of approximately 1.26 million shares.

299.   But Ubiquiti's description in the 2015 10-K and in subsequent SEC filings of the Company's internal control failures still did not fully alert the market to the extent of these problems because they misstated whether the Company's internal control failures could have resulted in any material misstatements in its financial statements and the extent and effectiveness of Ubiquiti's remediation efforts.   In the face of Ubiquiti's misrepresenting the extent of its internal control failures, and later claiming that they were remedied by mid-2017, market analysts did not know how these risks would develop.

300.   Furthermore, the market also did not know yet of all the Company's other problems, including its misstating Ubiquiti Community and financial metrics, its false and

misleading descriptions of Ubiquiti's "disruptive business model," the improper practices and flawed oversight of the Company's distributors, the Company's unfounded guidance for the second quarter of fiscal 2018, its related-party transactions, and the SEC's regulatory oversight of these issues.

301.   Given the uncertainty and lack of information surrounding Ubiquiti, the reaction of many market analysts was to simply avoid covering the Company at all.   On August 8, 2017, Morgan Stanley discontinued its coverage of Ubiquiti without any explanation other than a "reallocation of resources."   In that note, Morgan Stanley explained that despite its prior concerns about the Company's oversight, the market put more stock in the Company's earnings strength and its repurchasing of shares that lowered the Company's share count by 10%.

302.   Several other analysts in addition to Morgan Stanley have also stopped covering Ubiquiti since the beginning of the Class Period, including UBS (in October 2013), Stephens Inc. (in November 2015), SunTrust Robinson Humphrey (in April 2016), Guggenheim Securities (in October 2016), Wells Fargo (in August 2017), and Morningstar (in March 2018).

303.   It was not until later that investors learned of the risk that Ubiquiti's failings subjected it to regulatory oversight, or of the Company's other problems described above.

304.   Then, on September 18, 2017, the Citron Report described the many problems at Ubiquiti described above, including its false disclosures related to the Ubiquiti Community and accounts receivable, as well as basic problems with the Company's business model and operations, including related to the Company's distributors, its management and Board oversight, and the other suspicious circumstances described above.   Citron announced its report in a tweet sent at 9:46 am, Eastern Standard Time, stating "Citron Reports on $UBNT. Believe total FRAUD. All claims supported by fact. citronresearch.com. Not seen anything like this in

YEARS."

305.   That same day, Ubiquiti's stock price fell precipitously on unusually high trading volume of approximately 11.7 million shares.  The Company's stock price closed at $50.62 per share on September 18, 2017, which was nearly 8% lower than its closing price the prior trading day (September 15, 2017) of $54.95 per share and 7.5% lower than its opening price on September 18, 2017 of $54.75 per share.

306.   The Citron Report, however, did not fully reveal Ubiquiti's fraud because Defendants reacted quickly to stem the market's negative reaction to this report.  Ubiquiti used a multipronged approach of vehemently denying the points raised by the Citron Report and announcing unrelated positive news to distract the market's attention from Citron's accusations and give the market confidence in the Company's health.  Moreover, investors still did not know the extent to which the problems raised by the Citron Report would lead to—or had already triggered—regulatory oversight.

307.   First, after the market closed that day, September 18, 2017, Ubiquiti filed a Form 8-K announcing an increased range for the Company's revenue guidance for the quarter ending 12 days later, on September 30, 2018 (*i.e.*, 1Q18), increasing guidance from $230-$250 million to $240-$250 million. In addition, the Form 8-K announced that the Board had approved a $100 million stock repurchase program (which was in addition to the $50 million program that had been approved on March 3, 2017 and another $50 million program that had been approved on September 5, 2017).  The Form 8-K also reaffirmed the Company's full year 2018 guidance and stated that Pera would host an Investor Update on September 26, 2017 to discuss the Company's strategy, financial guidance, and outlook. That would be Ubiquiti's first ever Investor's Day.

308.   In addition to issuing the Form 8-K on September 18, 2017, Pera himself

responded to the Citron Report with the tweets described above (*see supra* ¶¶ 273-76).

309.   Some market analysts did not agree with the Citron Report in light of the Ubiquiti's denials and its continued positive disclosures about its financial performance.   For example, as reported by SeekingAlpha, JMP analyst Erik Suppiger stated during a September 18, 2017 call with Bloomberg's First Word radio program that he "does not see fraud" as alleged by Citron. SeekingAlpha also reported on September 19, 2017 that Raymond James analyst Tavis McCourt had "dismisse[d the] fraud accusations against Ubiquiti." On September 19, 2017, JMP issued a short "Estimate Changes" report on Ubiquiti, entitled "UBNT Guides Higher as Short Seller Report Fuels Stock Volatility," noting that Defendants had raised Ubiquiti's guidance in the September 18, 2017 Form 8-K, "presumably in response to volatility caused by a short seller report alleging that the company has been acting fraudulently."

310.   Ubiquiti also used its September 26, 2017 Investor Day conference to dismiss the Citron Report's accusations.   Pera forcefully denied the claims in the Report when asked specifically about them by stating, "[w]ell, first, it's kind of hard to tell someone the sky is really blue. I could – what am I going to do? Tell him, look up, the sky is blue. And then he – and then people are shouting, no, the sky is red. How do you argue with that?"

311.   Pera also used his remarks on the call to reassure investors and reaffirm the same types of misstatements concerning Ubiquiti's operations that Defendants had been making throughout the Class Period (*see supra* ¶¶ 277-81).

312.   Defendants' strategy of denial and distraction in response to the Citron Report worked.   On September 26, 2017, BMO Capital Markets published a report about the Investor Conference, noting that "[t]he event highlighted Ubiquiti's unique corporate structure and outlined the company's priorities and growth drivers. We maintain our Market Perform rating on

the shares." BMO also bought into Ubiquiti's standard message that "Ubiquiti sells an array of wireless networking solutions that are targeted at under-penetrated and under-served markets. Ubiquiti employs a disruptive pricing model and has built a loyal and engaged user community that has helped drive adoption of its platform even without a conventional sales force."

313. Similarly, on September 27, 2017, JMP issued a report evaluating Ubiquiti in light of the Company's Investor Day. JMP concluded that management had effectively responded to investor concerns related to fraud and low margins and maintained a Market Perform rating for the Company. JMP dismissed the Citron Report, stating that "while we acknowledge that Ubiquiti has some unconventional business practices, we do not believe various issues noted last week reflect fraudulent activity as some investors suggest." JMP specifically noted that Pera "fielded a wide array of investor questions – a distinct departure from Mr. Pera's past practice of having relatively limited investor engagement." Pera deviated from his usual practice in order to do everything he could to respond to the Citron Report.

314. Then, on November 9, 2017, before the market opened, Ubiquiti filed a Form 8-K admitting that it had significantly misstated the number of registered users in the Ubiquiti Community. The Company's previously reported figure of there being over 4 million registered users in the Ubiquiti Community that the Company claimed was so central to its "disruptive business model" was vastly overstated because "[i]n actuality, as of December 31, 2016, the Ubiquiti Community included" just 609,000 registered users.

315. But Defendants then continued their strategy of distracting the public from the true ramifications of the Citron Report. Ubiquiti made this damaging disclosure at the same time that it issued a press release announcing its generally positive 1Q18 financial results (net income of $74.9 million, $0.92 diluted EPS, and revenues of $254.9 million) and 2Q18 revenue guidance

(revenues between $240 million and $250 million, and GAAP diluted EPS of $0.85 – $0.92). In addition, the November 9, 2017 press release again touted the Company's release in mid-August of its new "FrontRow" camera consumer product.

316. Ubiquiti also announced alongside its November 9, 2017 disclosure of the overstated Ubiquiti Community metrics, the favorable news for investors that the Board had approved yet another $50 million in share repurchases.

317. Also on November 9, 2017, Ubiquiti held an earnings conference call during which Pera made several positive statements about the Company's financial results, expectations, and operations, including that he "think[s] this quarter was the best in our history, and we have a lot of work to do, but I'm pretty confident our best quarters are still ahead of us."

318. Pera also specifically responded to a question about the Company's correction of the Ubiquiti Community figures by stating, "Yes, sounds like your shorts are getting nervous. So I don't think that number is really that critical of an observation. Our IR people mixed up user sessions and total users. But regardless, our user community is more engaged than ever. We have more stories, requests for more features, more – just excitement overall. And if you compare it to, say, 2 or 3 years back, where our R&D wasn't executing at nearly as high a level, it's a huge improvement in my opinion in the quality of the community engagement."

319. In addition, Ubiquity filed with the SEC on November 9, 2017, an updated version of the investor presentation that it had previously filed on August 10, 2017. As discussed above, this presentation touted many aspects of the Company's "disruptive business model," which continued to emphasize the importance of the Ubiquiti Community, although it changed several metrics related to the Community—including the previously misstated figure of over 4 million registered users.

320.   Investors reacted negatively to this surprising disclosure that Ubiquiti had vastly overstated its Community metrics.  On November 10, 2017, JMP issued a report evaluating the Company's financial results for the first quarter of 2018 and financial guidance for the second quarter, as well as Pera's statements at Ubiquiti's Investor Day conference.   JMP's report discussed the Company's unexpected announcement that it overstated the Ubiquiti Community figures, stating:

> At its first ever analyst day, Ubiquiti broke out several metrics for its user community, including the number of registered user[s]. However, yesterday management noted that the original number posted represented the number of user sessions instead of the number of registered users, thus changing the reported number of registered users down to 600k from the previously reported 4 million.

321.   On November 9, 2017, in response to the Ubiquiti's pre-market disclosure that it had grossly overstated the size of the Ubiquiti Community, and despite the positive statements that Defendants made to try and distract attention from that error, the Company's stock price fell approximately 3.8% on unusually high trading volume.  The Company's stock price closed at $62.63 per share on November 9, 2017.

322.   If Ubiquiti did not add unrelated positive news to distract investors from its misstatement of the size of the Ubiquiti Community, the Company's stock price would have fallen even further on November 9, 2017.

323.   Then, on February 8, 2018, before the market opened, Ubiquiti issued a press release announcing its disappointing financial results for the second quarter of 2018 that missed its prior earnings per share guidance for the quarter and announced its revenue guidance for the third quarter. The Company's Form 8-K filed with the press release also announced that the Company's Board had approved yet another stock repurchase program, for $150 million.

324.   The February 8, 2018 press release also explained that because the Company's new consumer camera product, FrontRow, released the previous August, was not selling, the

Company had already been forced to writeoff its inventory of the product: "Gross margin includes $18.6 million of charges primarily related to provisions for obsolete inventory, vendor deposits and loss on purchase commitments associated primarily with the Company's FrontRow consumer-oriented product launched in August 2017."

325.   On this news, including that Ubiquiti had missed its earnings per share guidance for the second quarter of 2018 and already needed to write off its FrontRow inventory, the price of Ubiquiti stock dropped significantly, falling $11.04 per share, or over than 14%, from its prior closing price of $78.50 per share on February 7, 2018, to a closing price of $67.46 per share on February 8, 2018, on unusually high trading volume.

326.   Analysts attributed this negative sentiment to the Company's missing its second quarter guidance as a result of its FrontRow writeoff.  For example, BMO Capital Markets published a report on February 8, 2018, entitled "Slightly Lower Outlook; Remain Market Perform," noting that Ubiquiti "would have beaten [EPS] estimates excluding the $18.6" million "one-time charge related to FrontRow."  Similarly, JMP's February 9, 2018 report, "GM Falls on Inventory Write-Down & Reduced Outlook on Back-End Loaded Quarter," agreed that "[d]espite posting solid revenue numbers, the company significantly missed our GM, OM and EPS targets due to a one-time inventory write-down of obsolete FrontRow camera inventory."

327.   By this time, the market had largely forgotten about the Citron Report because of Ubiquiti's successful efforts at denying Citron's accusations and distracting investors by making other positive announcements.  For example, on or about February 15, 2018, market blogger Bert Hochfeld published a report on SeekingAlpha.com entitled "Ubiquiti: Dinged By Its Own Business Model."  Hochfeld considered Ubiquiti a good investment and attributed its underperformance in the second quarter of 2018 "entirely" to the Company's writeoff of its

"misbegotten [FrontRow] consumer camera offering." Hochfeld also argued against the premise of the Citron Report because he viewed the Company's financial disclosures since that time as supporting its business model. (*See also supra* ¶¶ 312-13).

328.   The market was therefore shocked when, on February 20, 2018, Ubiquiti revealed that, in fact, there was far more to the issues raised in the Citron Report than Ubiquiti and Pera had let on. The Company announced in an 8-K filing signed by Pera that "[o]n February 13, 2018, the Securities and Exchange Commission (the "SEC") issued subpoenas to Ubiquiti Networks, Inc. (the "Company") and certain of the Company's officers requesting *documents and information relating to a range of topics, including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties*. The Company is in the process of responding to the requests and intends to cooperate fully with the SEC." (Emphasis added).

329.   This news confirmed that the points raised by the Citron Report were far more substantial than investors had been led to believe. As a result, Ubiquiti's share price fell $18.76, or 25.34%, to close at $55.28 on February 20, 2018 on unusually high trading volume of approximately 5.5 million shares.

330.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

331.   Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in ¶ 199 above for the reasons described in the Substantive Allegations section of this amended

complaint.

332.   The Individual Defendants' actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which certified that the SEC filings "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  Before vouching for the accuracy of the statements made in Ubiquiti's SEC filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations of Ubiquiti described therein.

333.   Defendant Pera's scienter is also established by his unusually tight control of Ubiquiti as its CEO, Chairman, and founder.   In addition, because Pera chose to run the Company without the layers of oversight that ordinary public companies have, he is even more involved in all aspects of its operations than an ordinary CEO would be.

334.   As Morningstar reported on October 2, 2017, "we consider Ubiquiti to be overly dependent on [Pera's] judgment and decision-making. . . .   Ubiquiti's bare-bones organizational structure and consequent lack of controls in place may have left the company exposed to various challenges. . . .   Finally, Pera acquired the Memphis Grizzlies NBA basketball team in 2012, which may prove to be a distraction, given his very hands-on approach to managing Ubiquiti."   Morningstar was also concerned that the Company's Board contained only three independent directors, which the analyst deemed inadequate, specifically because of Pera's "influence as founder CEO, and chairman."

335.   Similarly, Ubiquiti states that as the Company's founder, Chairman, CEO, and majority owner, Pera "is able to exercise voting rights with respect to a majority of the voting

power of our outstanding stock and therefore has the ability to control the outcome of matters submitted to our stockholders for approval, including the election of directors and any merger, consolidation, or sale of all or substantially all of our assets. . . .  In addition, Mr. Pera has the ability to control the management and major strategic investments of our company as a result of his position as our Chief Executive Officer and his ability to control the election or replacement of our directors. . . .  As a board member and officer, Mr. Pera owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, even a controlling stockholder, Mr. Pera is entitled to vote his shares in his own interests, which may not always be in the interests of our stockholders generally."

336.   Pera has also affirmed his unusually high level of involvement in the Company's operations.  For example, after the Company's $46.7 million fraud in 2015, he told investors that "I've been through stages of denial, disbelief, frustration" and assured them that "[w]e're taking it really seriously. It's embarrassing. All I can say is everybody knows how big of an issue it is. *I've inserted myself into the finance team and I will have more presence there moving forward to make sure that this can't happen again*."  (Emphasis added).

337.   Similarly, Pera stated at the Company's September 26, 2017 Investor Day that "I don't want to be the leader in the movies that sits up high in a castle and watches all of his soldiers, who he feels expendable get killed off one by one. I want to be the guy leading by example. I want to be the guy on the battlefield. And I think that top-down accountability is very important because when you have the small teams and something goes wrong, the worst thing for culture is somebody saying, 'Well, that's not my job'. If somebody sees a problem, they have to attack it. Just like I attack it. I don't consider myself lower -- above any job. I'll go into the

forums, I'll go into the lab, I'll rework products, I don't care. I want that culture. And that's why I do the things I do."

338.   In addition, Defendants' admissions concerning its internal control failures that it said existed through at least March 2017, including that "Management, with the participation of the Company's Chief Executive Officer and Chief Accounting Officer[s], evaluated the effectiveness of our disclosure controls and procedures" and concluded based on that review that the internal controls were fundamentally inadequate, as well as the fact that these individuals were involved in supposed remediation efforts, shows that Pera, Spragg, and Radigan had firsthand knowledge of the full extent of these internal control failures.

339.   Defendants also had knowledge of its distributors' past violations of U.S. sanctions and other regulations (including the Iranian Transactions and Sanctions Regulations) prohibiting the sale of goods to certain countries and suspicious parties.   Indeed, OFAC determined that "members of Ubiquiti's senior management knew or had reason to know that Ubiquiti products were reexported to Iran."   Ubiquiti also discussed these issues in its SEC filings from before through the beginning of the Class Period.

340.   The Individual Defendants other than Pera were all in charge of Ubiquiti's accounting or financial practices during their time at the Company, either as CFO or CAO. These individuals would therefore have had unique knowledge of Ubiquiti's inadequate internal controls and its financial disclosures related to its sales with its distributors.

341.   In addition, the evidence discussed above shows Pera's clear decision to devote insufficient resources to Ubiquiti's operations, oversight, and financial controls.   The types of problems that resulted, including misstating important information about the Company's finances and basic operations, and doing business with unsavory distributors that engaged in

improper practices, is the foreseeable and logical result of such inadequate oversight.  That is particularly true for a Company that sells nearly all of its goods through distributors, who in turn sell the vast majority of those products in foreign countries.  Defendants therefore should have known the true practices of its distributors, particularly as to the  "limited number of [its] distributors that represent a significant portion of [Ubiquiti's] sales."  To the extent that Ubiquiti received insufficient information concerning its distributors improper practices, Pera is fully responsible for that failing that resulted directly from his reckless decision to employ inadequate internal controls and an insufficient organizational structure.  Pera constantly touted Ubiquiti's "unusual" and "disruptive business model."  He cannot evade liability based on his reckless decision to run the Company as if it were his personal, private entity, without providing the level of oversight that it required.

342.   For example, when the problem of Ubiquiti's distributors selling to prohibited parties in violation of U.S. regulations came to light, Ubiquiti blamed these serious compliance violations on the fact that "[u]ntil early 2010, we lacked sufficient familiarity with the export control and sanctions laws and their applicability to our products. Our lack of sufficient familiarity was largely due to our lean corporate infrastructure, the inexperience of our management team in these matters and the fact that our products are manufactured outside the United States and most of our products never enter the United States."   But Ubiquiti did not correct these problems.  It turned out that in 2015, Ubiquiti still had totally inadequate internal controls.

343.   At the Company's September 26, 2017 Investor Day presentation following the Citron Report, Pera admitted that Ubiquiti's inadequate internal controls resulted from his failing to provide the financial team with sufficient resources.  He stated that "[e]verybody knows I give

preferential treatment to R&D and drivers and value makers. And, I think, there was some animosity with the financial team, a lot of them came from that private equity events. And it was just bad, it's kind of gotten cancerous."

344.   As another example of Defendants ignoring their responsibility to make truthful and accurate statements to investors, Defendant Spragg signed Ubiquiti's Form 10-K for fiscal 2015 (which covered the year ending on June 30, 2015) and accompanying SOX declaration on August 21, 2015 even though he did not join the Company until August 4 of 2015—after the time period that the report covered and just a couple of weeks after he signed the report.

345.   Even more egregiously, Defendant Radigan signed Ubiquiti's Form 10-Q for the quarter for the quarter that ended March 31, 2016 even though he did not join the Company until May 3, 2016—also after the time period that the report covered and just two days before he signed the report.

346.   Defendants Spragg and Radigan could not possibly have truly attested to the financial figures and descriptions of the Company's operations in these reports—particularly the SOX certifications and statements that they "evaluated the effectiveness of our disclosure controls and procedures" right after they joined—and as of a time before they joined—the Company.

347.   Defendants also had very large financial incentives to perpetuate Ubiquiti's fraud. Pera has used his wealth from his majority ownership in the Company to advance other business interests.   Because he pledged up to 25% of his shares as collateral for his purchase of an increased stake in the Memphis Grizzlies basketball team in a transaction that was set in motion in late 2017, it was crucial for him that those shares retained their value.   A precipitous drop in the Company's stock price would require him to "sell shares . . . to meet . . . repayment

requirements" or, at the very least, to post additional shares as collateral for his loan.

348. Furthermore, Pera is incentivized to continue to keep Ubiquiti's fraudulent practices hidden because he has told the Company that "he may in the future from time to time pledge additional shares of common stock as collateral for margin or other loans, enter into derivative transactions based on the value of our common stock, dispose of shares of common stock, otherwise monetize shares of his common stock and/or engage in other transactions relating to shares of our common stock and/or other securities of the company."

349. Benjamin Moore's undisclosed personal connection to Streakwave (one of Ubiquiti's largest distributors) and his status from the Company's IPO through the Class Period as Pera's second-in-command also raises questions about Pera's and Ubiquiti's actions and motives when running the Company.

350. In addition to these unique financial incentives, Defendants' scienter is further established because several of the Individual Defendants profited from the sale of Ubiquiti stock during the Class Period while in possession of material, non-public information regarding the true nature of Ubiquiti's business model and internal controls. (*See supra* ¶¶ 176-77, 184-85).

351. The Individual Defendants' scienter is also established because the alleged misstatements and omissions at issue here concerned Ubiquiti's core operations, including its internal controls, its relationships with its distributors, and its descriptions of key financial metrics and business operations. Indeed, one of the central allegations is that Defendants made many statements misrepresenting the Company's "disruptive business model," which was the core way that Defendants described the Company to the investing public. Defendants, by virtue of their roles in senior management and involvement in Company's core operations, would have had knowledge of the Company's basic business model, including its relationships with its key distributors. In addition, Defendants had access to reports and communications describing these operations.

352.   Given the significance of an SEC investigation that began in December 2016, if not earlier, into the key aspects of Ubiquiti's operations, Defendants also would have been aware of and involved in efforts to respond to that investigation.  Pera would have been involved in any such effort given his tight control of the Company.  And Radigan would have been involved at the very least in responding to the SEC's requests related to topics concerning the Company's accounting and financial practices.

353.   Furthermore, the sheer extent of Ubiquiti's internal control failures described above highlights that all of the Individual Defendants—Pera and the Company's principal financial and accounting officers during the Class Period—would have observed these gaping compliance holes on a daily basis.

354.   Ubiquiti itself had scienter as to the false and misleading nature of the statements described above based on the knowledge of the Individual Defendants, all of whom were among the Company's most senior executives and part of the Company's management team.  In addition, because the false and misleading statements at issue here relate to the Company's basic business model, the Company's scienter can be inferred because these statements would have been approved by corporate officials that knew they were false or misleading.

## VIII.   NO SAFE HARBOR

355.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the

extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## IX.   CLASS ACTION ALLEGATIONS

356.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ubiquiti securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

357.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Ubiquiti securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Ubiquiti or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

358.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

359.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

360.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Ubiquiti;

- whether the Individual Defendants caused Ubiquiti to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ubiquiti securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

361.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE:

**FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS**

362.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ubiquiti  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ubiquiti securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts

363.  Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

364. 563. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

365.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101

366.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

367.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ubiquiti securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ubiquiti securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

368.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ubiquiti securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ubiquiti's finances and business prospects.

369.   By virtue of their positions at Ubiquiti , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

370.  Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Ubiquiti, the Individual Defendants had knowledge of the details of Ubiquiti's internal affairs.

371.  The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ubiquiti.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ubiquiti's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ubiquiti securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Ubiquiti's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ubiquiti securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

372. During the Class Period, Ubiquiti securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ubiquiti securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ubiquiti securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ubiquiti securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

373. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

374. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XII.   COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

375. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

376.   During the Class Period, the Individual Defendants participated in the operation and management of Ubiquiti, and conducted and participated, directly and indirectly, in the conduct of Ubiquiti's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ubiquiti's misstatement of income and expenses and false financial statements.

377.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ubiquiti's financial condition and results of operations, and to correct promptly any public statements issued by Ubiquiti which had become materially false or misleading.

378.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ubiquiti disseminated in the marketplace during the Class Period concerning Ubiquiti's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ubiquiti to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Ubiquiti within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ubiquiti securities.

379.   Each of the Individual Defendants, therefore, acted as a controlling person of Ubiquiti.  By reason of their senior management positions and/or being directors of Ubiquiti, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ubiquiti to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ubiquiti and possessed

the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

380.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ubiquiti.

## XIII.   <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XIV.   <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  December 24, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Michael Grunfeld
Jennifer B. Sobers
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100

Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         mgrunfeld@pomlaw.com
         jsobers@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiff*

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 24, 2018, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by other means to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.

_  /s/ Jeremy A. Lieberman _
Jeremy A. Lieberman