**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE UBIQUITI NETWORKS, INC. SECURITIES LITIGATION | No. 1:18-cv-01620 (VM) |
| | Class Action |
| THIS DOCUMENT RELATES TO: ALL CASES | |

**DECLARATION OF JEREMY A. LIEBERMAN IN SUPPORT OF LEAD PLAINTIFF'S (1) UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND COMPENSATORY AWARD TO LEAD PLAINTIFF**

# TABLE OF CONTENTS

I.      SUMMARY OF LEAD PLAINTIFF'S CLAIMS ................................................ 4

II.     PROCEDURAL HISTORY ................................................................................ 5

III.    THE SETTLEMENT ......................................................................................... 9

        A.      Reasons for the Settlement ..................................................................... 9

        B.      Confirmatory Discovery ....................................................................... 12

        C.      Settlement Terms .................................................................................. 14

IV.     THE COURT'S PRELIMINARY APPROVAL ORDER AND PLAINTIFFS'
        DISSEMINATION OF NOTICE .................................................................... 15

        A.      Preliminary Approval Order .................................................................. 15

        B.      Notice .................................................................................................... 17

        C.      Reaction of the Class ............................................................................ 18

        D.      The Plan of Allocation .......................................................................... 18

V.      LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES
        AND REIMBURSMENT OF EXPENSES ..................................................... 22

        A.      Attorneys' Fees ..................................................................................... 22

        B.      Costs and Expenses .............................................................................. 25

VI.     AN AWARD TO THE LEAD PLAINTIFF IS WARRANTED ..................... 25

I, Jeremy A. Lieberman, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a partner at the Pomerantz LLP ("Pomerantz") law firm, court-appointed Lead Counsel on behalf of Lead Plaintiff Xiya Qian ("Qian" or "Lead Plaintiff") in the class action styled as *In re Ubiquiti Networks, Inc. Securities Litigation*, No. 1:18-cv-01620-VM (S.D.N.Y.) (the "Action").[1]

2.      I am duly admitted to practice in New York and before this Court.  I have personal knowledge of the matters set forth herein and, if called upon, could and would competently testify thereto.

3.      I respectfully submit this Declaration ("Decl." or "Declaration") in support of the following: (1) Lead Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds; and (2) Lead Plaintiff's Unopposed Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Award to Lead Plaintiff.  The terms of the Settlement are set forth in the Stipulation.  The Court preliminarily approved the Stipulation by its Order Preliminarily Approving Settlement and Providing for Notice, filed on the docket December 11, 2019.  (Dkt. No. 40, "Preliminary Approval Order").

4.      This Declaration sets forth the nature of the claims asserted, the Action's procedural history, and the methods by which the Settlement Class was notified of the Settlement.  It also demonstrates the reasons why the Settlement and Plan of Allocation are fair, reasonable, and adequate, and why Counsel's application for attorneys' fees, reimbursement of expenses, and an award for Lead Plaintiff should be approved.

---

[1] All capitalized terms that are not otherwise defined herein have the meanings provided in the Stipulation of Settlement, dated December 2, 2019 (Docket ("Dkt.") No. 39-1) ("Stipulation"). Unless indicated otherwise, "Dkt. No." references herein are to the *In re Ubiquiti Networks, Inc. Securities Litigation*, No. 1:18-cv-01620-VM (S.D.N.Y.), docket.

5.     The settlement contemplated by the Stipulation ("Settlement") provides for a payment of fifteen million U.S. dollars ($15,000,000.00) in cash in exchange for the release of all claims asserted by Lead Plaintiff against defendant Ubiquiti Networks, Inc. (n/k/a Ubiquiti Inc.) ("Ubiquiti" or the "Company"), and defendants Robert Pera ("Pera"), Craig L. Foster, Mark Spragg, and Kevin Radigan ("Radigan") (collectively, the "Individual Defendants"; and, together with Ubiquiti, "Defendants") and completely resolves this Action.  While Lead Counsel believes that the allegations in the Consolidated Amended Class Action Complaint (the "Complaint," Dkt. No. 26) have substantial merit, Lead Counsel respectfully submits that the Settlement represents an excellent result for the Class.

6.     The Settlement is the result of extensive arm's-length settlement negotiations among esteemed and experienced counsel.  Through an all-day mediation session with the assistance of Jed D. Melnick of JAMS acting as mediator, and periodic subsequent correspondence between the parties, the Settling Parties vigorously debated the strengths and weaknesses of the claims and defenses in this Action.  The ability of Counsel to reach a compromise in light of the many complex issues present in this Action evidences the skill of representation and the quality of the results.

7.     Pursuant to the Preliminary Approval Order, 170,735 Notices of Proposed Settlement of Class Action ("Notice") and Proof of Claim and Release Forms ("Claim Form") (collectively, the "Notice Packet") were mailed to potential Settlement Class Members, brokers and other nominees, and the Notice Packet, the Preliminary Approval Order, and the Stipulation were posted online at www.UbiquitiNetworksSecuritiesLitigation.com. *See* Declaration of Jack Ewashko Regarding: (A) Mailing of the Notice Packet; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date, dated February 13,

2020 ("Ewashko Decl."), at ¶¶ 2-12, 15, submitted as Exhibit ("Ex.") 1 hereto.  The Summary Notice of Pendency and Proposed Settlement of Class Action and Final Approval Hearing ("Summary Notice") was posted in print in the national edition of *Investor's Business Daily* on January 6, 2020 and by wire on *GlobeNewswire* on January 10, 2020.  Ewashko Decl., ¶ 13 and Ex. B.

8.      For approximately two years prior to the Settlement, Counsel have successfully overcome the significant obstacles that this Action presented and adeptly navigated the complicated issues of law and fact inherent in prosecuting this claim.  The Settlement provides an immediate and certain benefit to the Settlement Class, considering the significant risks that a smaller recovery—or, indeed, no recovery—might be achieved after motions to dismiss, for summary judgement, for class certification, and trial and the likely appeals that would follow, which could prolong the Action for years.  For these reasons and those set forth more fully below, Counsel respectfully submits that the Settlement is in the best interests of the Settlement Class and should be approved as fair, adequate, and reasonable.

9.      Counsel also respectfully requests that the Court approve the Plan of Allocation for the Settlement proceeds, the award of attorneys' fees in the amount of five million U.S. dollars ($5,000,000) plus accrued interest, and reimbursement of expenses in the amount of $91,267.89 as fair and reasonable.  The fee award constitutes one-third (33.33%) of the Settlement Fund, which is within the range of attorneys' fees regularly awarded by courts within the Second Circuit and is reasonable in light of the relevant factors, including the quality of the representation, the complexity of the Action, and the Settlement Class' reaction to the fee request.  The expenses incurred were reasonable and necessary to prosecute this Action and to reach this favorable result for the Settlement Class.  Counsel also respectfully requests an award

of five thousand U.S. dollars ($5,000.00) to Lead Plaintiff for her substantial efforts in leading the prosecution of the Action.

## I.    SUMMARY OF LEAD PLAINTIFF'S CLAIMS

10.    Lead Plaintiff's claims are set forth in the Complaint (Dkt. No. 26), which asserts claims against Defendants on behalf of Ubiquiti investors during the Class Period. The Complaint alleges that, during the Settlement Class Period, Defendants issued false and misleading statements pertaining to Ubiquiti's business and operations.    Specifically, the Complaint alleges that: (i) Defendants misstated Ubiquiti's accounts receivable and failed to writedown accounts receivable for distributors from whom Ubiquiti could not expect repayment; (ii) Ubiquiti lacked an effective system of internal controls over financial reporting and misstated or failed to disclose facts related to that failure; (iii) Ubiquiti's financial performance was not attributable to what Defendants characterized as the Company's "disruptive business model," but rather, was a result of the improper practices of Ubiquiti's distributors and Ubiquiti's flawed internal controls; (iv) Defendants overstated the number of members or level of engagement of the Ubiquiti Community; (v) Ubiquiti's forecasted financial growth prospects for the second quarter and full year of its fiscal 2018 had no basis in reality because the Company's inventory of its FrontRow product had become obsolete and needed to be written down; (vi) Defendants failed to disclose the Company's related party transactions with Streakwave, which was one of the Company's top distributors and was associated with one of Ubiquiti's top executives (vii) as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading; and (viii) the foregoing conduct was likely to—or, as of December 2016, already did—result in increased regulatory oversight, including the fact that Ubiquiti was under investigation by the U.S. Securities and Exchange Commission ("SEC") "relating to a range of topics, including metrics relating to the Ubiquiti Community, accounting practices, financial

information, auditors, international trade practices, and relationships with distributors and various other third parties."

11.     The Complaint alleges that investors learned the truth through a series of corrective disclosures during the Class Period that culminated in the revelation on February 20, 2018 that the SEC issued subpoenas to Ubiquiti "and certain of [the Company's] officers requesting documents and information relating to a range of topics, including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties."  The Complaint alleges that after the announcement of the SEC's investigation, Ubiquiti' share price fell $18.76, or 25.34%, to close at $55.28 on February 20, 2018 on unusually high trading volume of approximately 5.5 million shares.

12.     The Complaint charges that Defendants' conduct violated Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b), and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     Defendants continue to deny that they committed any acts or omissions giving rise to any liability and/or violation of the law.

## II.     PROCEDURAL HISTORY

14.     Following revelation of the SEC's subpoenas, Lead Counsel began a thorough investigation.   Among other investigative efforts, Lead Counsel reviewed and analyzed information regarding Ubiquiti's SEC filings, press releases, earnings calls, analyst reports, analyst presentations, share-price movements, and public statements, as well as information in news articles and other publications.

15.     On February 21, 2018, Paul Vanderheiden filed a securities class action complaint in the Southern District of New York ("S.D.N.Y.") against the Defendants, styled *Vanderheiden v. Ubiquiti Networks, Inc. et al*, No. 1:18-cv-01620 ("*Vanderheiden* Action") (Dkt. No. 1).

16.     On February 28, 2018, Lead Plaintiff filed a second securities class action complaint in the S.D.N.Y. against the Defendants, styled *Qian v. Ubiquiti Networks, Inc. et al*, No. 1:18-cv-01841 ("*Qian* Action") (*Qian* Action, Dkt. No. 1).

17.     On March 13, 2018, John Kho filed a third securities class action complaint in the S.D.N.Y. against defendants Ubiquiti, Pera, and Radigan, styled *Kho v. Ubiquiti Networks, Inc. et al*, No. 18-cv-02242 ("*Kho* Action") (*Kho* Action, Dkt. No. 1).

18.     On April 23, 2018, a motion was filed to consolidate the *Vanderheiden* Action, the *Qian* Action, and the *Kho* Action, and to appoint Qian as Lead Plaintiff over the consolidated actions (Dkt. No. 14).

19.     On October 24, 2018, the Court entered an Order consolidating the *Vanderheiden* Action, the *Qian* Action, and the *Kho* Action under the caption *In re Ubiquiti Networks, Inc. Securities Litigation*, No. 1:18-cv-01620, and appointing Qian as Lead Plaintiff for the consolidated action, and approved Lead Plaitniff's selection of Pomerantz as Lead Counsel (Dkt. No. 25).

20.     On December 24, 2018, Lead Plaintiff filed and served the Complaint against Defendants (Dkt. No. 26).

21.     On February 22, 2019, Defendants sent Lead Counsel a letter pursuant to Rule II.B.1 of the Court's Individual Rules of Practice ("Rule II.B.1"), presenting Defendants' arguments concerning alleged pleading deficiencies in the Complaint.  The Court entered this letter on the docket on February 25, 2019.  (Dkt. No. 30).

22.     On March 1, 2019, pursuant to Rule II.B.1, Lead Plaintiff responded to Defendants' Motion to Dismiss Pre-Motion Letter, which the Court entered on the docket on March 4, 2019.  (Dkt. No. 31).  Lead Plaintiff explained in this letter, based on extensive legal research, why the Complaint is well-pleaded and Defendants did not have any basis to file a Motion to Dismiss the Complaint.

23.     On March 12, 2019, Defendants wrote a letter to the Court pursuant to Rule II.B.1 responding to Lead Plaintiff's March 1, 2019 letter, which the Court entered on the docket on March 14, 2019.  (Dkt. No. 32).  This letter presented Defendants' arguments as to why Defendants believed they had grounds to file a Motion to Dismiss the Complaint.  On this date, the parties completed their Motion to Dismiss Pre-Motion Letters pursuant to Rule II.B.1. (Dkt. Nos. 32-34.)

24.     On May 23, 2019, the Court held a telephonic hearing on Defendants' proposed Motion to Dismiss.  At the hearing, the Settling Parties presented their respective arguments concerning Defendants' proposed Motion to Dismiss the Complaint.   Lead Counsel explained why Defendants did not have any basis to file a Motion to Dismiss.  The Court indicated at this hearing that it was not inclined to dismiss the Complaint in its entirety and agreed to Defendants' request to submit an additional letter on the topics discussed.

25.     On June 7, 2019, Defendants wrote a letter, pursuant to the Court's May 23, 2019 Order, further describing Defendants' arguments in support of their proposed Motion to Dismiss. (Dkt. No. 36).

26.     On August 1, 2019, before the Court determined whether it was necessary for Lead Plaintiff to respond to Defendants' June 7, 2019 letter, the Settling Parties informed the Court that they were planning to mediate.  Lead Plaintiff entered the mediation with the

understanding that the Court was not inclined to grant Defendants' proposed Motion to Dismiss in its entirety. That guidance from the Court informed Lead Plaintiff's position in the mediation.

27.     The Settling Parties had previously engaged in settlement discussions in early 2019, but were not able to reach an agreement at that time to resolve the Action. The Settling Parties then reopened settlement discussions in mid-2019.

28.     On October 7, 2019, the Settling Parties participated in an all-day mediation with the assistance of Jed D. Melnick of JAMS. Prior to that session, the Settling Parties drafted and exchanged detailed mediation statements and exhibits, addressing issues of liability and damages. During the mediation session, both sides debated the merits of Lead Plaintiff's claims and the defenses to those claims. The negotiations, though collegial, were adversarial. Lead Plaintiff, through Lead Counsel, consulted with a damages expert to evaluate recoverable losses and as part of the extensive damages analysis that was done for the settlement discussions and mediation. The mediation session culminated in an agreement in principle to settle the Litigation for $15 million, which was memorialized in a memorandum of understanding executed on October 16, 2019 (the "MOU").

29.     Pursuant to the MOU, the Settling Parties agreed to a process of informal discovery intended to allow Lead Counsel to conduct due diligence and confirm in good faith that the proposed Settlement is fair, reasonable, and adequate. To that end, the parties negotiated and agreed on the scope of Defendants' confirmatory discovery, which was expressly made a term of the MOU and the Stipulation. On October 30, 2019, in the context of settlement negotiations and as provided in the MOU, Ubiquiti produced 15,766 pages of documents to Lead Plaintiff on a confidential basis for confirmatory discovery. This was the document production

that Ubiquiti made in response to the SEC's February 2018 requests that are referenced in the Complaint and was therefore highly relevant to Lead Plaintiff's allegations.

30.     On December 2, 2019, Lead Plaintiff filed a motion for preliminary approval of settlement.  (Dkt. Nos. 37-39).

31.     On December 11, 2019, the Court issued the Preliminary Approval Order. (Dkt. No. 40).  The Court scheduled the Settlement Hearing for final approval of the Settlement, attorney's fees and expenses, Lead Plaintiff's compensatory award, and to hear any objections by Settlement Class Members for March 27, 2020, at 10:00 a.m.

32.     Thereafter, Ubiquiti and/or Defendants' insurers have paid $15 million into an escrow account for the Settlement Class's benefit, $250 thousand of which is earmarked for Notice and Administration Expenses.

## III.    THE SETTLEMENT

### A.    Reasons for the Settlement

33.     Although Lead Plaintiff and Lead Counsel strongly believe that the claims asserted in this Action are meritorious and that the evidence developed to date supports them, they recognize and acknowledge the substantial expense and duration of continued proceedings that would be necessary to prosecute the Action.  Lead Plaintiff and Lead Counsel are also mindful of the inherent difficulty of proving claims under the federal securities laws and the possible defenses to the claims asserted in this Action, as well as the uncertainties presented by complex litigation.

34.     If the Settling Parties did not agree to settle, they would have faced an expensive discovery process, motion to dismiss, class certification, and summary judgment briefing, and the risks of trial.  A jury would have to determine numerous complex securities law issues and navigate battles of the experts regarding market efficiency, loss causation, damages, and other

issues related to Defendants' liability.  For example, a jury would have to determine: (i) whether Defendants made false or misleading statements or omissions; (ii) whether the alleged misrepresentations and omissions were material; (iii) whether Defendants acted with scienter; (iv) whether Lead Plaintiff's claims are timely; (v) whether Ubiquiti Securities traded in an efficient market, entitling Lead Plaintiff to a presumption of reliance; and (vi) the artificial inflation of Ubiquiti Securities and how much of the price declines on the corrective disclosure dates alleged in the Complaint resulted from the alleged corrective disclosures.  Any recovery would be very uncertain and, because of the near certainty of appeals, inevitably delayed by years.

35.     The scope of merits discovery would be very large given the length of the Class Period and the severity of the allegations in the Complaint.  The parties would have had to incur substantial costs and engage in prolonged litigation through summary judgment, trial, and likely appeals.  Discovery costs (including document production and hosting fees) would be significant.  Lead Counsel would anticipate, given the complexities, reviewing at least hundreds of thousands of pages of documents, if not more, and taking many depositions.

36.     In addition to merits discovery, the Settling Parties would have to engage in expert discovery on questions of class certification, reliance, loss causation, and damages, amongst other topics.  The parties would present dueling experts and incur substantial costs (including for expert reports and testimony regarding market efficiency, price impact, damages, and merits topics).  Even assuming a favorable trial outcome, Defendants would likely appeal, further delaying any benefit to the Settlement Class.  Moreover, even if a larger judgment were recoverable at trial, courts recognize that delay occasioned by trial, post-trial, and appellate processes greatly reduces the value of any award.

37.     Despite Lead Counsel's confidence, there are significant risks to proving liability and damages.  Even though the Court indicated that it is not inclined to grant Defendants' proposed motion to dismiss in its entirety, Lead Plaintiff would still need to defend against Defendants' planned motion in order to ensure that the full set of claims in the Complaint can proceed.  If Lead Plaintiff was successful in doing so, she would then have to survive summary judgment and establish falsity, materiality, scienter, and the timeliness of her claims to a jury's satisfaction.

38.     In particular, Lead Plaintiff would need to prove the materiality of Defendants' misstatement of the number of users in its Ubiquiti Community and the falsity of Defendants' other alleged misstatements—including statements concerning Ubiquiti's "disruptive business model," internal controls, accounting practices, and financial forecasts for the FrontRow camera—that Defendants argued in their Pre-Motion Letters were not false or were mere puffery. (*See* Dkt. No 32).  Moreover, proving scienter for all of these alleged misstatements is notoriously difficult, risky and uncertain, and Defendants made clear that they would strongly contest this issue.  (*See* Dkt. No. 36).

39.     Defendants also vigorously contested the amount of potential class-wide damages in this Action on statute of limitations grounds.  In addition, even assuming Lead Plaintiff could prove loss causation, Defendants strongly contested the amount of actual damages that the proposed class suffered based on the amount of Ubiquiti shares that traded during the proposed class period.

40.     In contrast to the foregoing, the Settlement represents an immediate and certain benefit for the Settlement Class.  Lead Counsel, having evaluated the substantial risk, time, and

expense required to prosecute this Action through trial and appeals, strongly believes that the Settlement is a very favorable result for the Settlement Class.

### B.   Confirmatory Discovery

41.   As part of its confirmatory discovery review described above, Lead Counsel prepared a detailed review template to be implemented by a team of attorney reviewers staffed by Lead Counsel.  This team reviewed, indexed and analyzed the documents in a carefully organized process.  The review team focused on the topics covered by the SEC's subpoenas to the Company, including "metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties."  The review team also researched and analyzed other available information that is relevant to the allegations in the Complaint as those issues have developed over the course of the Action and during the mediation process.

42.   The review team coordinated its review via frequent team meetings led by Lead Counsel's team leader and one-on-one follow-up discussions of their findings and work product.

43.   Attorneys on the review team were assigned specific fact issues to research and analyze, including:

      a.   The Ubiquiti Community metrics;

      b.   Ubiquiti's accounting practices;

      c.   Ubiquiti's financial information;

      d.   Ubiquiti's relationship with its distributors, including its international trade practices and other noteworthy information related to Ubiquiti's distributors;

      e.   Interactions with related parties;

      f.   The financial performance of Ubiquiti's FrontRow camera;

      g.   Ubiquiti's corporate governance practices;

h. The progress of the SEC's investigation that Ubiquiti announced in February 2018;

i. Other red flags raised by the Citron Report that are described in Section IV.G of the Complaint;

j. Ubiquiti's recent settlement of a related derivative action that is referenced in Section 1.25 of the Stipulation; and

k. The amount of potential damages based on the amount of shares that were traded during the Settlement Class Period.

44. The review team prepared detailed memoranda that summarized and analyzed the evidence regarding these critical factual issues. Lead Counsel closely scrutinized these memoranda and related underlying documents. Lead Counsel concluded, based on this analysis and a realistic estimation of class-wide damages, that a recovery of $15 million is an excellent outcome.

45. Given the large size of this project and the need to complete it on an expedited basis, Lead Counsel convened a team of attorneys retained on a contract basis (categorized as "Project Associates") to assist with the effort. Pomerantz carefully selected highly qualified and experienced attorneys for this project. All five of the attorneys listed as Project Associates in the Lodestar Report, submitted as Ex. A to the Declaration of Jeremy A. Lieberman on Behalf of Pomerantz LLP in Support of Unopposed Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Award to Lead Plaintiff, dated February 13, 2020, which is itself submitted as Ex. 2 hereto ("Pomerantz Decl."), have previous experience with securities litigation and all have been admitted to the bar for at least 10 years. As shown in the summary of the review team's work described above, the review team did the highly substantive work of analyzing and summarizing documents related to key issues in the Action, including their preparation of memoranda on these topics.

C.     **Settlement Terms**

46.     The Settlement provides the Settlement Class with $15 million in cash, which Lead Plaintiff estimates at 11% of estimated damages.

47.     Lead Plaintiff and Lead Counsel retained Stanford Consulting Group, Inc., which provides research, analysis, and expert testimony in complex business litigation, particularly securities class actions, to provide advice on potential damages in the Action.

48.     Together, they analyzed several damages scenarios based on the corrective disclosures alleged in the Complaint under multiple common trading models designed to reflect investor behavior.   Applying these methodologies to corrective disclosure dates that showed statistically significant price declines led to class-wide damages ranging from approximately $184 million to $100 million, with damages most likely falling at the midpoint of that range.

49.     In addition, Defendants contested the amount of class-wide damages available and disagreed with Lead Plaintiff's damage calculation, even putting aside arguments related to liability and loss causation.  This challenge was based on issues concerning the amount of actual harm that members of the proposed Class could have suffered.  The Settlement therefore could represent an even higher percentage of total possible damages than it does under Lead Plaintiff's estimate.

50.     The $15 million Settlement amount is a highly favorable result that is well above the median settlement for similar securities class actions.  *See* Stefan Boettrich & Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019), at 35 (Fig. 27), 36 (Fig. 28) (showing the median settlement value in securities class actions in 2018 was just 2.6% of estimated damages, and for cases between 1996-2018 with

NERA-defined investor losses between $100-199 million was only 3.1%);[2] Laarni T. Bulan, Ellen M. Ryan, & Laura E. Simmons, *Securities Class Action Settlements – 2018 Review and Analysis* (Cornerstone Research 2019), at 6 (Fig. 5) (between 2009-2017, the median settlement in securities class actions with simplified tiered damages ranging between $75-149 million and $150-249 million was approximately 5% and 4%, respectively, whereas the median settlement in 2018 for these ranges was approximately 4.9% and 9.4%, respectively; between 2009-2017, median settlement was approximately 5.1% of simplified tiered damages for all securities class actions and, in 2018, median settlement was approximately 6% for all securities class actions).[3] These studies tend to focus on the size of the settlement relative to transaction losses, not recoverable damages, and therefore probably understate the recovery rate. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). In addition, the Settlement represents a much higher percentage of Defendants' damages estimate, which was substantially lower than Lead Plaintiff's estimate.

51.     Defendants have not admitted to any liability or any wrongdoing as part of the Settlement and adamantly maintain that they are not liable to the Settlement Class.

## IV.     THE COURT'S PRELIMINARY APPROVAL ORDER AND PLAINTIFFS' DISSEMINATION OF NOTICE

### A.     Preliminary Approval Order

52.     On December 11, 2019, the Court issued the Preliminary Approval Order (Dkt. No. 40).

53.     In the Preliminary Approval Order, the Court:

---

[2] *See* https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf.

[3] *See* https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2018-Review-and-Analysis.pdf.

a)      preliminarily approved the Stipulation and the Settlement set forth therein, subject to further consideration at the Settlement Hearing;

b)      scheduled a Settlement Hearing for March 27, 2020, at 10:00 a.m., to determine whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate and should be approved; whether a judgment as provided in the Stipulation should be entered; whether the proposed Plan of Allocation should be approved; and to determine any amount of fees and expenses that should be awarded to Lead Counsel and to Lead Plaintiff;

c)      appointed JND Legal Administration ("JND" or "Claims Administrator") to supervise and administer the notice procedure as well as the processing of claims;

d)      approved the form and content of the Notice of Proposed Settlement of Class Action ("Notice"), the Proof of Claim and Release form ("Proof of Claim"), and the Summary Notice;

e)      directed JND to take all reasonable efforts to cause a copy of the Notice and Proof of Claim to be mailed by first-class mail to potential Settlement Class Members;

f)      directed copies of the Notice and Proof of Claim to be posted on a JND website designated for the Action no later than December 27, 2019 (the "Notice Date");

g)      directed Counsel, through JND, to cause the Summary Notice to be posted over *GlobeNewswire* and to be published in the national edition of *Investor's Business Daily* no later than fourteen (14) calendar days after the Notice Date;

h)      directed Counsel to serve on Defendants' counsel and file with the Court proof of such mailing and publication at least seven (7) calendar days prior to the Settlement Hearing;

i)      established procedures and deadlines for Settlement Class Members to object to the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or award to Lead Plaintiff and to appear at the Settlement Hearing; and

j)      established procedures and deadlines for Settlement Class Members to submit Proofs of Claim or seek exclusion.

**B.      Notice**

54.      Attached hereto as Ex. 1 is a true and correct copy of the Ewashko Declaration, which sets forth the efforts undertaken by JND to mail the Notice and Proof of Claim to potential Settlement Class Members, to publish the Summary Notice, and to establish the website and Internet notice.

55.      As detailed in the Ewashko Decl., JND mailed or caused to be mailed a total of 170,735 Notice Packets through first-class mail to potential Settlement Class Members, brokers and other nominees.  The Summary Notice was published in the national edition of *Investor's Business Daily* on January 6, 2020 and posted over *GlobeNewswire* on January 10, 2020.

56.      Additionally, JND posted the Notice Packet, the Preliminary Approval Order, and the Stipulation on JND's website, www.UbiquitiNetworksSecuritiesLitigation.com.

57.      As required by Federal Rule of Civil Procedure 23, due process, and the PSLRA, 15 U.S.C. §78u-4(f)(7), the Notice: (a) described the nature of the Action; (b) included the definition of the Settlement Class; (c) set forth the Settlement Class' claims; (d) described the Settlement's terms; (e) described the Plan of Allocation; (f) disclosed that Lead Counsel intends to seek attorneys' fees of one-third (33.33%) of the Settlement Fund, plus reimbursement of expenses up to $275,000, and an award for Lead Plaintiff up to $7,500.00; (g) advised Settlement Class Members of the right to exclude themselves from the Settlement Class and the binding effect of not doing so; (h) provided the deadline and procedure for filing a proof of claim, opting-out of the Settlement, or opposing the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or award to Lead Plaintiff; (i) provided the necessary information for any Settlement Class Member to examine the Court records should they so desire; (j) provided the date, time, and place of the Settlement Hearing; (k) summarized the reasons why the Settling Parties are proposing the Settlement; (l) provided the contact information for Lead

Counsel; (m) provided instructions to securities brokers and other nominee holders for forwarding the Notice to those persons for whom the nominees held shares in street name; and (n) stated the binding effect of a judgment on Settlement Class Members.

58.     The notice procedures set forth above satisfied federal due process because they more than adequately apprised the interested parties of the pendency of the Action and afforded them the opportunity to present their objections.

### C.     Reaction of the Class

59.     To date, neither Lead Counsel nor defense counsel has received any objection to the Settlement, the Plan of Allocation, the attorneys' fees award, the requested reimbursement of expenses, or the award to Lead Plaintiff from any Settlement Class Member, and they have received only three requests for exclusion.

### D.     The Plan of Allocation

60.     Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Settlement Class Members who wish to participate in the Settlement must submit a Proof of Claim to JND postmarked no later than seven (7) calendar days after the date of the Settlement Hearing.  All Settlement Class Members who wish to exclude themselves from the Settlement must file a request for exclusion by March 6, 2020.

61.     As set forth in the Notice, all Settlement Class Members who timely file a valid Proof of Claim form entitling him/her to a recovery of $10.00 or more will receive a distribution of the Settlement proceeds, after deduction of attorneys' fees, expenses, notice/administration expenses, Lead Plaintiff's award, and taxes incurred on interest income earned by the gross Settlement Fund.  The distribution will be made in accordance with the Plan of Allocation set forth and described in detail in the Notice.

62.     The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund among Authorized Claimants who suffered economic loss as a result of Defendants' alleged fraud, as opposed to losses caused by market or industry factors not related to the alleged fraud.

63.     The Plan of Allocation was formulated by Lead Counsel, in consultation with a well-respected and experienced financial consultant, and was designed to ensure that the distribution of the Settlement Fund was fair and consistent with Lead Plaintiff's theory of the case, which asserted that there was a decline in the price of Ubiquiti shares reflecting a disclosure of the truth relating to the alleged misconduct and to ensure that the allocation comported with the federal securities laws, including principles of loss causation.

64.     The Plan of Allocation does not compensate losses resulting from "in and out" transactions—losses from sales made prior to revelation of truth.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("But if, say, the purchaser sells the shares before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").

65.     Perhaps most importantly, the Plan of Allocation does not discriminate between Settlement Class Members in the same position, as each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund.

66.     Lead Counsel and their financial consultant determined that this was the fairest method of allocation of the Net Settlement Fund.

67.     As noted above, Lead Plaintiff retained Stanford Consulting Group, Inc., which has great expertise in the field, to provide advice on potential damages in the Action.

68.     A plaintiff incurs damages when purchasing a share at a price inflated as a result of false or misleading statements and/or omissions, provided that a later curative disclosure of

that fraud causes the security price to decline.  Price inflation can be created by material misrepresentations and/or omissions on or before the purchase date, which remain uncorrected in whole or in part at that date.  Damages are mitigated if the share is later sold, while the price remains inflated, so that the original purchaser receives at sale an offsetting "bonus" equal to the dollar amount of inflation remaining at the sale date.  Price inflation may be measured from changes in security prices, net of market, industry, and other non-fraud-related effects, when the true condition and prospects of the company are partially or fully disclosed; price inflation present at the purchase date may be estimated by measuring the portion of the price decline caused by a curative disclosure.

69.     The actual loss suffered by a Settlement Class Period purchaser (between May 9, 2013, and February 19, 2018, both dates inclusive) in this Action is readily observed as the portion of the Ubiquiti-specific price decline—net of market and industry effects—caused by the revelation of fraud on September 18, 2017, February 8, 2018, and February 20, 2018. Accordingly, as demonstrated in the following table, if a Ubiquiti share of Common Stock was sold before September 18, 2017, the Recognized Loss for that security is $0.00, and any loss suffered is not compensable under the federal securities laws:

| Table 1 Artificial Inflation in Ubiquiti Common Stock | | |
|---|---|---|
| From | To | Per Share Price Inflation** |
| May 9, 2013 | September 17, 2017 | $32.09 |
| September 18, 2017 | February 7, 2018 | $27.62 |
| February 8, 2018 | February 19, 2018 | $18.49 |
| February 20, 2018 | Thereafter | $0.00 |

** Per-share price inflation shall not exceed the per-share purchase price for the stock.

70.     The Plan of Allocation limits cumulative payments of all claims associated with Ubiquiti Call Options and Put Options to 1.5% of the Net Settlement Fund because options trading accounted for only approximately 1.5% of total dollar trading volume for Ubiquiti

Securities during the Settlement Class Period.  The Plan of Allocation describes the Recognized Loss calculations for these securities.  The remainder of the Net Settlement Fund is allocated to claims associated with Ubiquiti Common Stock.

71.     Furthermore, in accordance with the "Limitation on Damages" provisions of the PSLRA (15 U.S.C. §78u-4(e)), damages on a share purchased during the Settlement Class Period and held as of the close of the 90-day period subsequent to the Settlement Class Period (the "90-Day Lookback Period") cannot exceed the difference between the purchase price paid for the share and the average price of the share during the 90-Day Lookback Period.  Damages on shares purchased during the Settlement Class Period and sold during the 90-Day Lookback Period cannot exceed the difference between the purchase price paid for the share and the rolling average price of the share during the portion of the 90-Day Lookback Period elapsed as of the date of sale.

72.     Additionally, under the U.S. Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005), damages are assessed only for shares purchased during the Settlement Class Period and retained through at least the first alleged curative disclosure—shares purchased during the Settlement Class Period and sold before the alleged curative disclosure do not incur damages.

73.     There have been no objections to the Plan of Allocation, which is set forth in the Notice.  Lead Plaintiff respectfully submits that it is fair, reasonable, and adequate and should be approved by the Court.

## V.     LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSMENT OF EXPENSES

### A.     Attorneys' Fees

74.     Lead Counsel have represented the Settlement Class on a wholly contingent basis for approximately two years, not receiving any payment for their service or the expenses incurred in prosecuting this Action against Defendants and negotiating the Settlement. Throughout this time, Lead Counsel's dedication to recovering a favorable result for the Settlement Class has been expensive and challenging.

75.     The Notice informed Settlement Class Members that Lead Counsel would apply for attorneys' fees in the amount of one-third (33.33%) of the Settlement Fund, plus reimbursement of expenses up to $275,000, and an award to Lead Plaintiff up to $7,500.00 in total.

76.     Counsel requests that the Court award a fee of one-third (33.33%) of the Settlement Fund, or $5,000,000.00, plus accrued interest.

77.     Lead Counsel intends to share part of any attorneys' fees awarded by the Court with other counsel in accordance with their level of contribution to the initiation, prosecution, and resolution of the Action, as provided for in Paragraph 7.2 of the Stipulation.

78.     As discussed in Lead Plaintiff's Memorandum of Law in Support of Unopposed Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Award to Lead Plaintiff filed concurrently herewith, the requested fee is within the range of reasonable fees awarded in common-fund cases.  The Order Awarding Attorneys' Fees & Reimbursement of Expenses from *In re Van Der Moolen Holding N.V. Sec. Litig.*, No. 03-CV-8284 (RWS) (S.D.N.Y. Dec. 6, 2006), referenced in Lead Plaintiff's Memorandum of Law, is submitted as Ex. 3 hereto.  The one-third (33.33%) fee is also strongly supported and should be approved

based on the facts on this case, including the superb result achieved for the Settlement Class, the skill required, the quality of work performed, and the risk of pursuing claims on a contingency basis.

79.     As set forth in the Lodestar Report included as Ex. A to the Pomerantz Decl., Pomerantz has committed 3,166.85 hours to litigating this Action from the initial investigation to its resolution, which includes time spent on:

a.  Preparing briefing in connection with the motion for appointment of lead plaintiff;

b.  Retaining and working with investigators to locate and interview numerous confidential witnesses, who were former employees of Ubiquiti with knowledge of the events relevant to the allegations in the Complaint;

c.  Reviewing and analyzing Ubiquiti's Settlement Class Period and pre- and post-Settlement Class Period SEC filings, annual reports, press releases, quarterly earnings calls, investment conference transcripts, and other public statements;

d.  Thoroughly researching the securities laws and intricacies of Ubiquiti's business and online community;

e.  Conducting all work with a damages expert, including retaining and consulting with the expert and analyzing and exchanging write-ups at various phases of the litigation and during the mediation and settlement process;

f.  Consulting with an accounting expert to analyze issues with respect to the accounting practices raised in the Complaint;

g.  Preparing the detailed Complaint, including drafting such complaint and performing all legal and factual analysis, and expert consultation;

h.  Preparing letter briefing in opposition to Defendants' proposed Motion to Dismiss the Complaint, which raised and evaluated numerous complex issues specific to the Action, and preparing for and participating in the telephonic hearing before the Court on these letters;

i.  Overseeing and conducting all mediation and settlement efforts, including, without limitation, drafting a mediation statement, participating in an all-day mediation session before mediator Jed D. Melnick of JAMS, making all presentations to the mediator, negotiating the settlement with counsel for Defendants, including the provision of informal discovery intended to allow Lead Counsel to confirm that the Settlement is fair, reasonable, and adequate, and

23

drafting and revising all settlement-related documents and court papers;

j.   Engaging in confirmatory discovery to ensure that the Settlement is fair, reasonable, and adequate, including the review and analysis of 15,766 pages of documents produced by Ubiquiti, as well as other available evidence related to important issues that arose as the Action progressed, and the preparation of substantive memoranda on specific subject matters;

k.   Obtaining competing bids for claims-administration work related to the Settlement before selecting a competitive bidder to serve as Claims Administrator, and worked with the Claims Administrator to effectuate notice and oversee the administration process;

l.   Securing the services of the Escrow Agent;

m.   Preparing the motion papers and related documents necessary to obtain preliminary approval of the Settlement and provide notice of the Settlement to Settlement Class Members; and

n.   Preparing the motion papers and related documents necessary to obtain final approval of the Settlement.

80.   Lead Counsel's expertise has been vital to obtaining such a favorable result for the Settlement Class.  As set forth in detail in the Pomerantz firm resume/biography, attached as Ex. C to the Pomerantz Decl., Pomerantz is a nationally-recognized class-action firm with extensive experience litigating and negotiating settlements as lead or co-Counsel in complex securities class actions.  Pomerantz has been appointed lead or co-lead counsel in many complex securities class actions and has recovered substantial sums for clients and class members. Pomerantz has prosecuted hundreds of such cases to successful resolution in its 80-year history and obtained billions of dollars in compensation for class members.

81.   Based on the hours expended by Pomerantz and the current billing rates for the firm's professionals, the total lodestar is $1,614,817.25.[4]  The lodestar results in a multiplier of

---

[4] Excludes work on motion seeking attorneys' fees, reimbursement of expenses, and awards to Plaintiffs.

approximately 3.10, which is determined by dividing the $5,000,000 requested fee by the firms' $1,614,817.25 total lodestar.

82.     The Lodestar Report attached as Ex. A to the Pomerantz Decl. lists the amount of time spent by Pomerantz in the prosecution of this Action.  The firms' time is taken from daily time records regularly prepared and maintained in the ordinary course of business.

83.     The number of hours reasonably and necessarily spent by Pomerantz on this Action is 3,166.85.  Pomerantz's hourly billing rates for the professionals working on this Action ranged from $330.00 to $975.00.  The hourly rates for attorneys and professional staff at Pomerantz are the usual and customary rates charged for each individual in non-contingent matters and conform to industry practice.

84.     As set forth in Lead Plaintiff's Memorandum of Law in Support of Unopposed Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Award to Lead Plaintiff, a multiplier of 3.10 is within the typical range of a fair and reasonable award.

### B.     Costs and Expenses

85.     The expenses incurred in the prosecution of this Action are set forth in Exhibit B to the Pomerantz Decl. ("Expense Summary").  In total, Lead Counsel has incurred $91,267.89 in expenses.

86.     The Expense Summary lists the unreimbursed expenses that Lead Counsel reasonably and necessarily incurred in the prosecution of this Action.

87.     These expenses are reasonable in light of the pace and duration of this Action and were necessarily incurred for its successful resolution.

## VI.     AN AWARD TO THE LEAD PLAINTIFF IS WARRANTED

88.     The Notice advised Settlement Class Members that Lead Plaintiff would seek an award of no greater than $7,500.00.

89.     Lead Plaintiff seeks an award in the amount of only $5,000.00.  This award is justified in light of Lead Plaintiff's efforts and lost time overseeing the prosecution of the Action, as well as the negotiations leading to the Settlement.   In particular, Lead Plaintiff (a) communicated with Lead Counsel regarding the posture and progress of the case; (b) compiled her trading data and completed her certification in connection with her motion to be appointed Lead Plaintiff; (c) reviewed all of the significant pleadings and pre-motion letters filed in the Action; (d) consulted with Lead Counsel regarding the settlement negotiations and mediation; and (e) evaluated and approved the proposed Settlement.   *See* Declaration of Xiya Qian in Support of Lead Plaintiff's Unopposed Motions for (I) Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds and (II) Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Award to Lead Plaintiff, dated February 6, 2020, at ¶ 4, submitted as Ex. 4 hereto.

90.     Given the important contributions and the time and effort expended by Lead Plaintiff, the requested award is warranted and should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 14, 2020

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman